**UNITED STATES of America,**

v.

**Lee Roy DUNFORD, Defendant.**

**No. CRIM. 97–73–R/A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Nov. 5, 1997.

659

Thomas L. Eckert, U.S. Attorney's Office, Roanoke, VA, for U.S.

Donald E. Earls, Norton, VA, William Martin Stanley, Jr., Cohen, Gettings, Dunham & Davis, P.C., Arlington, VA, for Defendant.

## OPINION AND ORDER

JONES, District Judge.

In this criminal prosecution for trafficking in counterfeit goods in violation of 18 U.S.C. § 2320, the defendant has filed motions to suppress evidence obtained during the execution of a search warrant and pursuant to consent-to-search forms. The defendant argues that the searches of his person, trailers, and stalls located on the premises ("Market") of the Farmer's Live Stock Market, Inc., in Tazewell County, Virginia, were invalid and that the evidence obtained pursuant to the searches should be suppressed because: (1) he was unlawfully detained; (2) the search warrant did not authorize a search of the defendant's person; (3) the search warrant failed to describe with particularity the vehicles to be searched and was therefore unconstitutionally overbroad; (4) the affidavit failed to present sufficient probable cause for

the warrant to issue; (5) no good faith exception existed to justify admission of the seized property; and (6) the executing officer did not have probable cause to conduct the searches. Further, the defendant argues that all statements made by him during the course of the searches must be suppressed because: (1) he is illiterate and therefore did not understand the waiver forms he executed; and (2) because his statements were made on the basis of law enforcement promises that he would be afforded special treatment if he acted in an informant capacity for the government. The defendant also moves for suppression of counterfeit merchandise seized from his warehouse and trailers located on the premise of his personal residence in Castlewood, Virginia. The defendant asserts that although the Castlewood search was conducted pursuant to two consent-to-search forms executed by him, the merchandise should nevertheless be suppressed because his consent was not freely and voluntarily given.

I find that (1) the defendant was lawfully detained pursuant to a valid search warrant and that the frisk of the defendant's person was a permissible search for weapons; (2) the search of his trailers at the Market was a legal search conducted pursuant to a valid search warrant; (3) the merchandise seized from his stalls is admissible because the defendant failed to establish the existence of a legitimate expectation of privacy in the stalls; (4) his consent to the Castlewood searches was freely and voluntarily given; and (5) his statements were voluntarily made with full knowledge of his rights. Accordingly, I deny the defendant's motions to suppress.

## I. Findings of Fact.

Based on the testimony and exhibits introduced at the hearing on the motions to suppress, held October 7, 1997, I make the following findings of fact.

1. On May 29, 1997, a federal search warrant was issued by a United States magistrate judge to Harold B. Gay, Jr., a United States Customs Service special agent, authorizing the search of the following premises:

The grounds and parking lot, exclusive [sic] a fixed structures and buildings, of the Farmer's Live Stock Market Inc of Tazwell [sic] located on state route 460 in Tazwell [sic] County, Virginia and across route 460 from Route 6 Box 94, Tazwell, [sic] Virginia and approximately 5 miles west of the town of Tazwell [sic] with a metal building on the property bearing a sign "Farmer's Live Stock Market, Inc. Of Tazwell" [sic] and as shown in the aerial photographs made a part of the affidavit in support of this search warrant together with any and all vehicles and trailers located on the said grounds and parking lot.

2. The counterfeit operation came to Gay's attention when Bernard Loos, a private investigator with Arnold, Mills and Associates ("Arnold Mills"), contacted him about the flea market and presented him with information that Loos had gathered concerning the sale of counterfeit merchandise at the Market. Arnold Mills was employed by certain trademark holders to investigate counterfeit activity. Gay worked with Loos from February, 1997, to June, 1997, before obtaining a search warrant for the Market. Loos also obtained additional information from another Arnold Mills investigator, which Loos shared with Gay.

3. In his search warrant affidavit, Gay reported that the Market was a livestock show and trading area and that it was also used for public "flea markets." The affidavit reported that the Market was a regular gathering place for traffickers in counterfeit goods and that law enforcement agents had visited the site on several occasions and determined that counterfeit goods were being sold wholesale to buyers at the Market. Gay alleged that on or about February 10, 1997, a private investigator with Arnold Mills informed him that several individuals were engaged in trafficking in counterfeit merchandise, clothing, and other apparel, and that these individuals routinely met each Sunday morning at the Market to display and sell the counterfeit merchandise.

4. The affidavit further reported that the investigating officers had observed a variety of vehicles, including trucks, vans, and passenger vehicles, parked at the Market amidst what appeared to be counterfeit merchandise located in boxes and on display tables. On more than one occasion two tractor trailers were observed at the Market, parked end-to-end. One of the tractor-trailers had a sign painted on it reading: "ST PAUL WHOLESALE, HIGHWAY 58 CASTLEWOOD, VA (703) 762–7210." Gay stated in the warrant affidavit that a private investigator informed him that on or about March 15, 1997, the investigator had observed the two tractor-trailers parked end-to-end and that three white males had been selling what appeared to be counterfeit merchandise from the trailers. One of the men wore a hat bearing the logo "ST PAUL WHOLESALE, LEE ROY." One of the trailers had a Virginia license plate, number UT 127–759, which the Virginia Department of Motor Vehicles identified as having been assigned to the defendant, Lee Roy Dunford.

5. On June 1, 1997, the search warrant was executed and a substantial quantity of counterfeit goods were seized from vehicles and animal stalls located at the Market. Gay and Douglas Fender, a Federal Bureau of Investigation special agent, were among a group of approximately fifteen law enforcement agents who arrived at 7:53 a.m. and secured the area. The agents announced that they were executing a search warrant and gathered the approximately twenty-five persons present under the roof of the livestock building. The agents had expected the merchandise to be displayed on the grounds and in the parking lot, but because it was raining, the dealers had begun instead to display merchandise in the Market's animal stalls, under the roof of the livestock building. The dealers, including the defendant, had rented the stalls from the owner of the Market for this purpose.

6. At the beginning of the search, Thomas Radermacher, a United States Customs Service special agent, went directly to the tractor-trailers which had been previously observed parked end-to-end. Before the search was initiated, Radermacher had been provided with a photograph of the defendant and had been assigned the duty of finding and interviewing him. Radermacher located the defendant at the tractor-trailer rigs. As

before, the trailers were parked end-to-end, the rear doors of both trailers were open, and a wooden platform, approximately five to six feet high, had been placed between the two trailers. Radermacher was able to see into both trailers and saw boxes setting inside. He also testified that he could see across the platform into stalls in the livestock building and that therein he could see merchandise outside of and in open boxes. Stairs ascended both sides of the platform and the defendant and another person were standing atop the platform when Radermacher arrived. Radermacher requested that the defendant and his companion come down off the platform and he inquired whether they had any weapons. The defendant's companion revealed that he had a gun, which was seized.

Radermacher subsequently frisked and then read to the defendant his *Miranda* rights.[1] The defendant stated that he understood his rights and that he was willing to talk with Radermacher. Radermacher urged the defendant to cooperate but made neither promises nor threats to encourage the defendant's cooperation. Radermarcher then took the defendant under the roof of the livestock building, out of the rain, and inquired whether the defendant had any money. In response, the defendant produced $5,545 from his wallet, which he explained was for his wholesale business. Radermacher kept and inventoried the funds in order to deter any later claim that the money had been lost or stolen. The money was subsequently seized. Radermacher then asked the defendant whether he was familiar with counterfeit merchandise. The defendant said he was not and stated that he was unaware that the merchandise he had been selling was counterfeit. The defendant also pointed out another merchant at the Market, later identified as Mr. Yi, as an individual from whom he had purchased some of his merchandise.

8. Shortly thereafter, Radermacher was joined by agents Gay and Fender, who took the defendant into an unoccupied portion of the livestock building, away from the rest of the persons being held for questioning. Both Gay and Fender were aware of the fact that the defendant had served as a government informant many years prior to the time of the search, and that he had worked with a state officer named Asberry. Fender and Gay identified themselves to the defendant and again advised him of his *Miranda* rights, both in writing and orally. The defendant then agreed to waive his rights and at 10:48 a.m. he signed a written waiver on the form stating his rights. Fender and Gay did not ask the defendant whether he could read, but the defendant did not express any inability to understand the form. In fact, the defendant is nearly illiterate, although experienced in business. The agents urged the defendant to cooperate and told him that cooperation would be in his best interest, but no specific promises were made in exchange for such cooperation. Fender told the defendant that Fender had been in contact with Asberry. Fender also told the defendant that any cooperation he exhibited would be made known to the United States attorney's office, but Fender never suggested to the defendant that he would not he prosecuted or would otherwise receive special treatment.

9. The defendant then informed Fender and Gay that the defendant had begun selling counterfeit items in December, 1996, but that he had not sold counterfeit goods outside of Virginia. He stated that he had purchased counterfeit goods from a woman he identified as Ms. Kim, who he had known for five or six years, and that during that period of time he had paid her an average of $500 to $600 per month for counterfeit goods. The defendant stated that he received regular shipments of counterfeit merchandise and that two such shipments were scheduled for the week of June 9, 1997. The defendant admitted that he had made approximately $13,000 in profit during the previous year dealing in counterfeit merchandise. He identified other merchants and detailed their involvement in the sale of counterfeit goods at the Market. Finally, the defendant revealed that he stored merchandise in a warehouse and in a trailer located at his home in Castlewood, Virginia.

10. During the defendant's questioning, Radermacher searched the defendant's trail-

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ers and stalls. From Radermacher's position outside of the trailers and stalls, he could see merchandise, but he could not determine if it was counterfeit from that distance. He was accompanied into the trailers·and stalls by an individual trained in identifying counterfeit merchandise. The stall areas were rectangular-shaped, open on one side where a gate had been removed. The stall ·walls were made of horizontal wooden slats, aligned with five to six inch gaps between each slat. The stall gates had been removed by the defendant and his helpers prior to the beginning of the search. On all days except Sunday, members of the public were invited in to make purchases. On Sundays, wholesale buyers with tax exempt numbers,[2] were permitted to move freely in and out of the stalls while viewing. the merchandise and making purchases. Officers seized several cases of counterfeit merchandise from the . trailers and stalls, and the trailers and tractors themselves were seized.

11. After the defendant was questioned by Gay and Fender,. he agreed to accompany agents to Castlewood (approximately one hour away) and to permit a search of his home, warehouse, and trailers. . Once they arrived in Castlewood, Fender discussed the defendant's rights with him, reviewed a consent-to-search form with him, and the defendant executed the form. At no time did Fender suggest to the defendant that a search warrant would be obtained if the defendant refused to cooperate. Marjorie Thompson, a United States Customs· Service special agent, who was present at the time that the defendant executed the consent form, also saw the defendant review the form. She heard some discussion about whether the defendant understood the form,. and then observed Fender go over the form with the defendant before it was signed. No statement was made to the defendant that a search warrant would be obtained if he refused to allow the search. After the search began, the defendant's . attorney arrived and consulted with the defendant. Neither the defendant nor his lawyer requested that the search cease, nor was the voluntariness of the defendant's consent to search questioned. The defendant did ask through his attorney that the police vehicles be moved out of the sight of his neighbors.

12. Law enforcement officials searched the defendant's home, warehouse, and one of his two trailers. The defendant initially granted permission for a search of both trailers. but he later withdrew consent on the basis that one of the trailers was rented to another party. The agents agreed that they would wait for the defendant to contact the lessee in an effort to acquire permission for a search of the trailer. No counterfeit merchandise was found in the defendant's home. The search of the one trailer and warehouse produced twenty-eight cases containing a variety of counterfeit merchandise. Agent Thompson, who assisted with the search at Castlewood, locked the rented trailer before the agents left and posted a notice on the trailer that it was not to be opened.

13. Fender, Allen L. Hollingsworth, a United States Customs Service special agent, and other agents returned the next day, June 2, 1997, to Castlewood, at which time the defendant told them that he had not been able to contact the lessee. Fender spoke by phone with the attorney who had been present the day before, and the attorney agreed that the defendant would execute a second consent-to-search form, permitting a search of the rented trailer. When the agents went to execute the search they found the trailer open and its contents in disarray. Inside, Hollingsworth discovered materials used in applying labels and logos to clothing, and it was evident that some of the materials had been used to apply trademarked symbols to clothing. He also found numerous t-shirts, sweatshirts, and shorts, without logos.

## II. Legal Analysis.

### A. Unlawful Detention.

■ The defendant argues that he was unlawfully detained pursuant to an invalid search warrant and that the search of his

---

**2.** Virginia imposes a tax on sales at retail,· other than for resale. A dealer who purchases for resale may obtain a registration number and give an exemption certificate, thus avoiding the tax. *See* Va.Code Ann. §§ 58.1–602, –603, –613 (Michie 1997).

person was illegal because it was not authorized by the warrant.

It is well established that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 706, 101 S.Ct. 2587, 2596, 69 L.Ed.2d 340 (1981); *United States v. Smith,* 704 F.2d 723, 725 (4th Cir.1983). Here, the defendant was held pursuant to a valid search warrant for the premises.[3] Accordingly, I find that the defendant's detention was not illegal.

### B. Search of the Defendant's Person.

■ The defendant accurately asserts that the warrant did not permit a search of his person. However, Radermacher testified that his search of the defendant's person was limited to an effort to secure weapons. The defendant's companion, who possessed a gun, was similarly frisked. It is well settled that a law enforcement officer conducting a stop or search, is entitled to conduct a frisk and limited search for weapons to protect himself *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). The evidence presented does not suggest that Radermacher's search exceeded the bounds of such a search.

The defendant implies that because Radermacher secured the defendant's money, the frisk rose to the level of an unauthorized search. However, neither the defendant nor Radermacher asserted that Radermacher seized the defendant's wallet or at any time searched the wallet for money or other evidence. Instead, Radermacher gave the defendant his *Miranda* rights, and then *asked* the defendant whether he had any money. The defendant voluntarily removed his wallet and exhibited the cash. Radermacher took possession of it for the purpose of securing it, not an unreasonable action in light of its large sum.

Finding that the defendant was properly detained pursuant to a valid warrant and that the search of his person did not exceed a permissible frisk to secure weapons, I deny the defendant's motion to suppress on these grounds.

### C. Search of the Defendant's Trailers.

■ The defendant argues that the search warrant was invalid on the basis that it was unconstitutionally overbroad because it failed to particularly describe the vehicles to be searched and because the affidavit failed to provide sufficient probable cause to support issuance of the warrant. Consequently, the defendant argues that the evidence seized from his trailers must be suppressed. I disagree.

Contrary to the defendant's argument on brief, my previous decision in the related case did not extend to finding that the warrant was invalid with regard to both all vehicles and all trailers. In fact, I held that the warrant affidavit provided probable cause to believe that counterfeit merchandise was located on the premise and in the trailers at the Market. More specifically, I found that "[t]he search warrant affidavit provided probable cause to believe that the vehicle bearing license plate number UT 127–759. and the vehicles belonging to certain individuals … would contain counterfeit merchandise." *United States v. Billy Joe Tignor,* Crim. No. 97–75–R/A (W.D.Va. Sept. 24, 1997). The affidavit specifically described the defendant's trailers, their location, the manner in which they were routinely parked, the license plate of one of the trailers which was registered to the defendant, and the sign reading "ST PAUL WHOLESALE, HIGHWAY 58 CASTLEWOOD, VA (703) 762–7210," painted on the side of one of the trailers. The affidavit also named the defendant, identifying him as the owner of one of the trailers and affiliating him with the St. Paul Wholesale business. Such evidence was

---

3. In a companion case arising out of this search, I held that the search warrant in question was invalid to the extent it permitted the search of "all vehicles" on the premises. *United States v. Billy Joe Tignor,* Crim. No. 97–75–R/A (W.D.Va. Sept. 24, 1997). However, this holding was limited to those facts and has no application here, where the defendant was specifically described in the warrant affidavit and identified as owning one of the trucks alleged to contain counterfeit goods.

sufficient to establish probable cause for the search of both the defendant's trailers.

### D. Search of the Defendant's Stalls.

■ The defendant argues that the search of the stalls used by him to display merchandise was illegal because the search warrant did not authorize the search of the fixed structures and buildings on the Market premises, which included the stalls.

In relevant part, the search warrant authorized a search of "[t]he grounds and parking lot, *exclusive a* [sic] *fixed structures and buildings,* of the Farmer's Live Stock Market Inc of Tazwell [sic]." The evidenced presented established that the stalls were a part of the metal building described in the warrant. The defendant properly reasons that the plain language of the warrant precluded a search of the stalls because they were in fact contained within one of the fixed structures or buildings located on the Market premises, and specifically excluded by the warrant.

■ However, I find that the merchandise seized from the defendant's stalls is nevertheless admissible because the defendant had no legitimate expectation of privacy within the stalls. *See Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The burden of proving such an interest rested with the defendant. *Id.* at 144–45, 99 S.Ct. at 431–32. As the Supreme Court noted in *Rakas,* the determination of whether such an interest has been shown does not turn on the question of whether the defendant has a property interest in the place to be searched, whether the defendant claims a possessory interest in the item to be seized, or whether the defendant legitimately occupied the place to be searched. *Id.* at 143 n. 12, 148, 149 n. 17, 99 S.Ct. at 430 n. 12, 433 n.17. Instead, all of these questions must be considered in resolving whether the facts of a particular case give rise to a legitimate expectation of privacy. *Id.* at 143 n. 12, 144–45, 149, 99 S.Ct. at 430 n. 12, 433. No single element is determinative, rather, "[a] search occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Maryland v. Macon,* 472 U.S.

463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (citation omitted).

Here, the defendant asserts that he had a legitimate expectation of privacy in the stalls which he rented for the purpose of conducting his business. The defendant's stepdaughter, who assisted him with his business, testified that whenever it rained the defendant's merchandise was displayed in the stalls. She explained that the gates of the stalls were removed prior to customers arriving and that subsequently, buyers were permitted to move freely in and out of the stall areas while viewing the merchandise and making purchases. She also indicated that on the day of the search, only individuals with tax exempt numbers, buying for resale, were permitted to make purchases.

While these facts clearly establish that the defendant had a possessory interest in the merchandise seized and that he legitimately occupied the stalls, I do not find that they rise to the level of establishing a legitimate expectation of privacy in the stalls. The stalls were open for buyers to move through them, handle the merchandise, and go through everything displayed. Gates on the stalls were specifically removed to provide easy access by members of the public. The only effort made by the defendant to control access to the area was asking individuals who were not authorized to purchase for resale to leave. However, the defendant testified that these individuals could access the stalls and only after they were identified as not having tax exempt numbers, would they be asked to leave.

Citing *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), the defendant argues that the fact that the stalls were open to members of the public does not preclude his claim of a legitimate expectation of privacy. In *Lo–Ji,* police officers, accompanied by a state magistrate, conducted a search of a bookstore retailing pornographic magazines and films. The magistrate issued a warrant based on his review of two films purchased from the store, and authorized the seizure of all other copies of the two films and any similar films. *Id.* at 321, 99 S.Ct. at 2321. He also left space on the warrant to add addi-

tional films, books, and other materials determined to be obscene. He then accompanied the executing officers to the store where he personally reviewed various books, magazines, and films, deciding what additional merchandise should be seized as he proceeded. *Id.* at 321–24, 99 S.Ct. at 2321–23. In conducting the search, the magistrate watched films in coin-operated booths without paying, removed magazines from the covers in which they were displayed, and had the store clerk remove from a glass case and permit him to examine movies in their containers. *Id.* at 321–24, 99 S.Ct. at 2321–23.

The Court held the warrant invalid, id. at 325, 99 S.Ct. at 2323, and also rejected the government's argument that the bookstore had no legitimate expectation of privacy against "wholesale" governmental intrusion because it displayed the contraband to the general public in areas of the store open to them. *Id.* at 329, 99 S.Ct. at 2325–26. In rejecting the government's expectation argument, the court specifically focused on the fact that the magistrate had engaged in a "wholesale" search of the store's contents in a manner in which a member of the public could not have engaged. The Court found material the fact that "[t]he Town Justice viewed the films, not as a customer, but without the payment a member of the public would be required to make. Similarly, in examining the books and in the manner of viewing the containers in which the films were packaged for sale, he was not seeing them as a customer would ordinarily see them." *Id.* at 329, 99 S.Ct. at 2325–26.

The facts of *Lo–Ji* are readily distinguishable from those in this case. First, *Lo–Ji* dealt with materials protected by the First Amendment. The Court specifically noted that special constraints are imposed upon searches and seizures of material so protected. *Id.* at 326 n. 5, 99 S.Ct. at 2324 n. 5; *see also New York v. P.J. Video, Inc.,* 475 U.S. 868, 873, 106 S.Ct. 1610, 1614, 89 L.Ed.2d 871 (1986) ("We have long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures. For this reason, we have required that cer-

tain special conditions be met before such seizures may be carried out.") No such materials were involved in this case, and therefore the need for heightened constraint is not implicated.

Second, in *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), the Court elaborated on its holding in *Lo–Ji,* explaining that the while the wholesale search and seizure of the store in *Lo–Ji* was not permissible under the precepts of the Fourth Amendment, no legitimate expectation of privacy existed in areas where the public was invited in to transact business. *Id.* at 469, 105 S.Ct. at 2781–82. In *Macon,* an undercover police officer entered a bookstore, browsed the contents, and purchased two pornographic magazines which the state subsequently sought to introduce into evidence. *Id.* at 465, 105 S.Ct. at 2779–80. The Court held that the

> [Bookstore owner] did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business. The mere expectation that the possibly illegal nature of a product will not come to the attention of the authorities, whether because a customer will not complain or because undercover officers will not transact business with the store, is not one that society is prepared to recognize as reasonable. The officer's action in entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy and hence did not constitute a search within the meaning of the Fourth Amendment.
>
> . . . .
>
> "A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." Nor does the First Amendment suggest a different conclusion in this case. Although a police officer may not engage in a "wholesale searc[h] and seizur[e]" in these circumstances, nothing in our cases renders invalid under the Fourth Amendment or the First Amendment the purchase as here by

the police of a few of a large number of magazines and other materials offered for sale.

*Id.* at 469–70, 105 S.Ct. at 2781–83 (citations omitted).

Like *Macon,* here the defendant's stalls were open to the public and individuals were invited to enter and transact business. I find that the expectation that a law enforcement official would not come into the stalls and discover the contraband is not one society would recognize as reasonable. The only appreciable differences between the procedure in *Macon* and in this case are the facts that First Amendment materials were not involved, a factor mitigating against suppression, and the fact that merchandise was seized, not purchased. This latter difference does not render Radermacher's actions unconstitutional. Both *Lo–Ji* and *Macon* held that "[o]f course, contraband may be seized without a warrant under the 'plain view' doctrine." *Lo–Ji,* 442 U.S. at 326 n. 5, 99 S.Ct. at 2324 n. 5; *see also Macon,* 472 U.S. at 469, 105 S.Ct. at 2782. As indicated by both the *Lo–Ji* and *Macon* decisions, what the *Lo–Ji* Court found objectionable was the fact that once inside the store the magistrate did not see contraband in plain view and seize it. Instead he literally searched the store, removing material from its packaging and inspecting it in a manner that no customer could have done. *Lo–Ji,* 442 U.S. at 329, 99 S.Ct. at 2325. Only after he had engaged in this wholesale search could he determine what items constituted contraband, a determination he could not have made simply by engaging in normal browsing activity, the essence of the plain view exception. *See Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.").

Here, unlike the magistrate in *Lo–Ji,* Radermacher viewed the goods displayed as any buyer could have done. As he testified, by merely handling the merchandise, or in some instances by simply looking closely at the goods, he or his associate could determine

whether the goods in question were .contraband. Accordingly, when he determined that the merchandise was counterfeit he was entitled to seize it. Merely acting as any customer can, and then seizing contraband that is in plain view, does not constitute the "wholesale search and seizure" found objectionable in *Lo–Ji. See Macon,* 472 U.S. at 470, 105 S.Ct. at 2782; *Lo–Ji,* 442 U.S. at 329, 99 S.Ct. at 2325–26.

Accordingly, finding that the defendant failed to establish a legitimate expectation of privacy in the stalls, I deny his motion to suppress the evidence seized therefrom.

### E. Admissibility of Statements.

By separate motion, the defendant also moves that I suppress any incriminating statements made by him. "The admissibility of [the defendant's] statement turns on whether the statement was voluntary under the Fifth Amendment which guarantees that 'no person ... shall be compelled in any criminal case to be witness against himself ... without due process of law.'" *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 192, —— L.Ed.2d —— (1997) (citation omitted). The test for voluntariness "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Id.* (quoting *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (alterations in the original)). My inquiry regarding the voluntariness of the defendant's statement must turn on a determination of "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Id.* (quoting *United .States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir.1987)).

■ Here, the defendant was initially questioned by Radermacher. While the evidence presented does not reflect that the defendant made any incriminating statements to Radermacher,[4] assuming arguendo

---

**4.** Radermacher testified that he had asked the defendant whether he was familiar with counter-

feit merchandise. Radermacher reported that the defendant had responded that he was unfa-

that such statements were made, the evidence is that the statements were made voluntarily. Radermacher, who was in plain clothes, did not take the defendant into custody, handcuff him, or otherwise seek to intimidate the defendant. Before questioning the defendant, he orally reviewed the defendant's rights with him, including his right to remain silent and his right to consult with legal counsel. Radermacher further testified that he did not make any promises to the defendant in exchange for his cooperation. Radermacher also stated that he made no reference of any kind to the proposition that the defendant serve as an informant or that the defendant would otherwise receive special treatment for speaking with Radermacher. Accordingly, I find the defendant's statements to Radermacher were voluntarily made and are therefore not inadmissible.

■ I also find that the statements made by the defendant to Gay and Fender were voluntary and need not be suppressed. The agents provided the defendant with a written statement of his rights which the defendant waived. As with his execution of the consent-to-search forms, the defendant asserts that because he is illiterate, he was unable to understand the forms which he signed. However, both Fender and Gay testified that they orally reviewed the defendant's rights with him, including his right to refuse to waive those rights. Fender stated that he read the form to the defendant before it was signed. Although they did not specifically ask the defendant if he could read or write, the defendant did not express any difficult in reading the form or in signing his name.

Furthermore, like the interview with Radermacher, the circumstances of the interview with Fender and Gay were non-threatening and routine. *See United States v. Braxton,* 112 F.3d at 781. The defendant was interviewed by two plain clothes agents, he was not under arrest, the interview took place

outside of a police facility, did not last for a prolonged period of time, and the defendant was not taken into custody even after the interview. *See id.* In addition, because of his work as an informant, the defendant had experience dealing with law enforcement and consequently was arguably less likely to be intimidated by the mere presence of the officers.

■ The defendant contends that despite his having been twice informed of his rights, and his having chosen to waive those rights, his statements should nevertheless be suppressed because his statements were made on the basis of Gay's and Fender's promise of special treatment for his cooperation as an informant. While both agents stated that they were aware that the defendant had previously served as a government informant, each testified that the only reference made to the defendant's former work as an informant was Fender's comment to the defendant that he had spoken with Asberry,[5] and that Fender was attempting to solicit the defendant's cooperation. Informing a defendant of the general benefits of cooperation with law enforcement does not, in the absence of some specific promise or offer, render a subsequent statement by a defendant involuntary. *United States v. Shears,* 762 F.2d 397, 401–02 (4th Cir.1985) (citing *United States v. Williams,* 479 F.2d 1138, 1139–1140 (4th Cir. 1973)); *Rachlin v. United States,* 723 F.2d 1373, 1377–79 (8th Cir.1983). Both agents advised the defendant to cooperate and that cooperation would be in his best interest, but no promises of any kind were offered in exchange for such cooperation. Fender further testified that both he and Gay, while encouraging the defendant's cooperation, specifically explained to him that although any cooperation would be made known to the United States Attorney's office, they were "not in any position to make any promises to him whatsoever." The only evidence sup-

---

miliar with counterfeit merchandise and that he had not realized that some of the merchandise he possessed and sold was counterfeit. The only other information Radermacher recalled the defendant providing was the identity of another merchant at the Market, later identified as Mr. Yi, from whom the defendant had purchased merchandise. Radermacher also testified that

the defendant did not make any statements to him during the walk from the location of the trailers into the livestock building where Gay and Fender questioned the defendant.

5. Asberry was the defendant's controlling agent while he served as a government informant.

porting the defendant's allegations that he was promised that he would not be prosecuted, would not serve any jail time, would receive special treatment, and that Gay and Fender wanted him to work as an informant, is the defendant's testimony that such promises were made, which I do not credit.

Accordingly, finding that the defendant was fully informed of his rights, that he made a knowing waiver of those rights, and that his statements were made voluntarily, I deny the defendant's motions to suppress his statements.

### F. Consent to Search.

■ The defendant argues that his consent to search his home, warehouse, and trailers, was not knowing and voluntary because his illiteracy rendered him unable to understand his rights. He further argues that he consented because he had been promised that he would receive special treatment in return for his cooperation and his acting as an informant.

To justify a search on the basis of consent, the government bears the "burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The test for voluntariness "is whether, given 'the totality of the circumstances,' the defendant's will has been 'overborne' or 'his capacity for self-determination critically impaired.'" *Eckstein v. Cullen,* 803 F.Supp. 1107, 1115 (E.D.Va.1992), *aff'd sub nom. Eckstein v. Melson,* 18 F.3d 1181 (4th Cir.1994) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)). As with the determination of the voluntariness of the defendant's statements, in considering the "totality of the circumstances," the court must look to the characteristics of the accused as well as the conditions under which the consent was given, e.g., "the officer's conduct; the number of officers present; and the duration, location, and time of the search." *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996). Moreover, the determination of voluntariness is a question of fact. *United States v. Hummer,* 916 F.2d 186, 189 (4th Cir.1990).

Here, Fender reviewed the first consent-to-search form with the defendant, explained his rights to him, and informed the defendant that he was not required to agree to the search. Thompson, who was present during the signing of the first consent form, saw the defendant look the form over and heard some discussion regarding whether the defendant understood the form. Moreover, she also observed Fender explain the form to the defendant before it was signed. Both Thompson and Fender stated that no reference was made to a search warrant being obtained if the defendant failed to consent to the search. Even after the arrival of the defendant's attorney, who consulted with the defendant about the search, no request was made to stop the search, nor was the voluntariness of the defendant's consent questioned. Moreover, the defendant did refuse at this time to consent to a search of the second trailer, which shows his ability to exercise independent judgment.

Similarly, Fender also orally reviewed the second consent-to-search form with the defendant. The defendant had access to his attorney prior to executing the second consent form, which the attorney agreed the defendant should execute. No promises were made to the defendant regarding the consent forms and at no time was it suggested to the defendant that in exchange for consenting, or operating as an informant, that he would be accorded special treatment. The defendant offers as proof of the existence of the informant arrangement, the fact that the police acted on his suggestion that their vehicles be concealed so as not to jeopardize his utility as an informant. No evidence was presented establishing that the defendant's rationale for moving the vehicles was shared with any one other than his attorney. However, assuming arguendo that the officers were aware of the impetus for the defendant's suggestion, this evidence alone is plainly insufficient to establish that such an arrangement, completely denied by the investigating agents, existed. When questioned by defense counsel about the relocation of the vehicles, Fender again denied that any arrangement had ever been made with defendant to serve as an informant, and Fender reiterated the fact that he had not

been in a position to offer any such deal to the defendant.

Further, as was the case with the defendant's statements, the circumstances under which his consent was granted were not threatening or coercive. The defendant was asked to consent by Fender, who the defendant had dealt with on the previous day. No threats of prosecution or incarceration were made. Nor was the defendant compelled by law enforcement threats that a warrant would or could be obtained if he did not agree to the searches. The defendant was permitted access to an attorney, and in fact, prior to signing the second consent form, his attorney approved his consent. In addition, the defendant was also familiar with law enforcement officials, and by virtue of his experience, was less likely to be intimidated by the mere request that he consider consenting to the searches.

Accordingly, having considered the totality of the circumstances, I find that the defendant's consent was freely and voluntarily given and therefore, that the product of the searches of his warehouse and trailers will not be suppressed.

### III. Conclusion.

For the reasons set forth above, it is **ORDERED** that the defendant's motion to suppress statements (Doc. No. 16) and his motion to suppress all searches and seizures (Doc. No. 17) are denied.