**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**PAULAVA MALALA, Defendant.**

High Court of American Samoa
Trial Division

CR No. 49-02

January 7, 2003

Before RICHMOND, Associate Justice, MAMEA, Associate Judge, and TUPUIVAO, Associate Judge.

Counsel: For Plaintiff, Frederick J. O'Brien
For Defendant, Bentley C. Adams III

ORDER DENYING MOTION TO SUPPRESS

Before the court is a motion to suppress statements given by the defendant in the course of police interrogation. We deny the motion.

## Findings of Fact

Based on the evidence adduced at the hearing on the motion on November 15, 2002, and judicial notice of the record in *American Samoa Government v. Paulava Malala*, CR No. 30-01, we make the following findings of fact.

Around 2:00 a.m. on Sunday July 14, 2002, there was a brawl in front of the Curve nightclub in Faganeanea. Several persons were injured. Because defendant Paulava Malala ("Malala") suffered a head wound, the police initially viewed him as a victim. Injured persons, including Malala, were taken to the hospital for medical examination and treatment. When he was released from the hospital, around 5:00 a.m. the same day, he was taken to the central police station in Fagatogo ("CPS") for general questioning by Det. John Cendrowski about the incident.

The police continued their investigation of the melee at the Curve. After interviewing some witnesses, Malala became a suspect in the fatal stabbing of another person and for discharge of a shotgun during the Curve incident. Malala was taken to the correctional facility at Tafuna ("TCF"), apparently later on July 14, 2002, allegedly for protection from possible retaliatory action by the deceased's family. The following day, Monday, July 15, 2002, Malala was arrested under a warrant issued for an alleged violation of a probation condition in CR No. 30-01. He was either served with this warrant at the TCF or taken there after this arrest.

During the midday of Tuesday July 16, 2002, at the direction of Capt. Va`a Sunia, the head of the Criminal Investigation Division ("CID") and lead investigator of the Curve incident, Lt. Ta`ase Sagapolutele escorted Malala from the TCF to the CID office at the CPS for questioning. Lt. Sagapolutele had not yet seen the autopsy report and was not sure of the cause of death. However, because Lt. Sagapolutele intended to conduct a custodial interrogation about Malala's participation in the brawl, he first gave Malala Miranda warnings that he had the right to remain silent and to have an attorney, and that anything he said could be used against him. Malala signed a waiver of his rights, written in Samoan, and proceeded to give a statement to Lt. Sagapolutele, first orally and then in his own handwriting, except for two changes made by Lt. Sagapolutele. The Lieutenant wrote "doorman" above a stricken word, which appears to be "door," and "thrusted" above the stricken word "waved" after Malala demonstrated what he did with the knife. He did not, however, initial or otherwise acknowledge the changes.

In essence, Malala wrote, with the two appended changes, that in self-

defense he removed a knife from his pants and thrusted it at someone, who may have been hurt a little. After one person hit his head with a beer bottle and another threw a bottle at his face, he was able to retrieve a shotgun from his car and fired it in the air twice to scare off people before his brother took the shotgun away from him. He then passed out. This is the written statement Malala seeks to suppress.

There are two points of contention regarding these events. First of all, Malala claims that when Lt. Sagapolutele told him to get into the police unit at the TCF to take him to the CPS, Malala refused and said he wanted a lawyer. In response, Lt. Sagapolutele hit the vehicle door, told him to get into the vehicle, and told him that there would be no attorney at that time. In effect, Malala asserts that Lt. Sagapolutele ignored Malala's plea for an attorney. Lt. Sagapolutele testified, on the other hand, that throughout his contact with Malala on July 16, Malala was cooperative and neither said, nor did, anything to make him believe that Malala did not want to talk with him.

The first issue boils down to credibility. We simply do not believe Malala's self-serving testimony. We are incredulous that Lt. Sagapolutele would ignore such a blatant appeal for an attorney.

The second point of contention concerns the overall tone and manner of the interrogation. In Malala's version, at the CID office, before he wrote the statement, Malala denied having a knife and stabbing the deceased victim and Lt. Sagapolutle responded by banging his fist on the table and screaming that something bad would happen to Malala if he did not speak the truth. He testified that several times Lt. Sagapolutele threatened to beat him and said Malala would be locked up forever. He also claims that Lt. Sagapolutele falsely stated that the deceased died of a gunshot wound, and if Malala admitted to the knife stabbing, he would not be prosecuted for the killing. Malala maintains that he was afraid and wrote what Lt. Sagapolutele told him what to write—untruths such as admitting that he had a knife in his pants but did not intend to kill anyone with one when he actually did not even have a knife on his person. Malala also stated that Lt. Sagapolutele offered to buy him lunch if he signed the written statement.

Lt. Sagapolutele contradicted Malala's testimony. He indicated that throughout his contact with Malala on July 15, Malala was cooperative, showed no fear, had no reservation about talking with him, and no difficulty writing his statement. Lt. Sagapolutele maintained that he did not raise his voice, threaten Malala with physical force, or make any promises or inducements. He did grant Malala's request for a cigarette break while Malala was still writing his statement. He had informed Malala that he would return with him to the TCF after the questioning, but he did not offer Malala lunch until he and Capt. Sunia, with Malala,

were on the way there, because he knew that the TCF lunch period was over.

Again, the issue boils down to credibility. We believe Lt. Sagapolutele's version.

## Analysis

▆▆▆ Plaintiff American Samoa Government ("ASG") "bears the burden of proving by a preponderance of the evidence that a defendant waived his *Miranda* rights." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998); *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Likewise, ASG "bears the burden of proving by a preponderance of the evidence that [a] statement was voluntary." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997). Our ultimate determination of both these issues is based on the totality of the circumstances. *Garibay*, 143 F.3d at 536 (waiver); *Braxton*, 112 F.3d at 781 (voluntariness).

### A. Request for Counsel

Malala argues that because he requested an attorney, the police were required to cease all interrogation until counsel had been made available. A little background is necessary.

▆▆▆ A suspect's right against self-incrimination, and the now familiar *Miranda* doctrine, arise in the context of custodial interrogation. *See* AM. SAMOA REV. CONST. art. I, § 6; U.S. CONST. amend. V; *Miranda v. Arizona*, 384 U.S. 436 (1966). In this setting, if a suspect requests counsel interrogation must cease until counsel is made available, "even if the suspect later attempts to waive that right." *United States v. Avants*, 278 F.3d 510, 514-15 (5th Cir. 2002) (explaining *Edwards v. Arizona*, 451 U.S. 477 (1981)). "Once the suspect has invoked the right to counsel, any subsequent conversation must be initiated by him." *Michigan v. Jackson*, 475 U.S. 625, 626 (1986) (quoting *Solem v. Stumes*, 465 U.S. 638, 641 (1984)) (explaining *Edwards* rule). The *Edwards* rule that interrogation must cease applies even if renewed interrogation concerns a separate investigation. *See Arizona v. Roberson*, 486 U.S. 675 (1988). Furthermore, the rule that an attorney be "made available" means that interrogation cannot resume "without counsel present." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

▆▆▆ Under the right to have the assistance of counsel, the rules are a little different. AM. SAMOA REV. CONST. art. I, § 6; U.S. CONST. amend VI. The right attaches "at or after the time that judicial proceedings have been initiated." *Main v. Moulton*, 474 U.S. 159, 176 (1985) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)); *see also Massiah v. United States*, 377 U.S. 201 (1964). In terms of interrogation, after the

53

right attaches, the accused has "the right to rely on counsel as a 'medium' between him and the State." *Moulton*, 474 U.S. at 176. The right "is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.* However, even though the right attaches, if an accused does not affirmatively request counsel, further interrogation is not forbidden as long as the accused properly waives his right. *Patterson v. Illinois*, 487 U.S. 285, 290-297 (1988) (finding that *Miranda* warnings are sufficient to apprise a suspect of his Sixth Amendment rights). On the other hand, if an accused affirmatively requests the assistance of counsel, further interrogation is prohibited without counsel present, despite a waiver of *Miranda* rights.[1] *See Michigan v. Jackson*, 475 U.S. 625, 636 (1986) (extending *Edwards* cease-interrogation and waiver rules to the Sixth Amendment); *see generally* Daniel A. Klein, Annotation, *Requirement, under Federal constitution, that law enforcement officer's custodial interrogation cease after suspect requests assistance of counsel-- Supreme Court cases*, 129 L.Ed.2d 955. *But see Texas v. Cobb*, 532 U.S. 162, 174-177 (2001) (Kennedy, J., concurring) (questioning continuing validity of *Jackson*).

## B. Right to Counsel

Because we have explicitly found, by a preponderance of the evidence, that Malala did not request an attorney, we can declare that the cease-interrogation rule is not applicable to this case. Therefore, as to this argument, it is irrelevant whether the interrogation took place under the rubric of the right against self-incrimination or the right to assistance of counsel.

■ Nonetheless, even though Malala did not request an attorney, he argues that because he was in custody for the parole violation, and because he was represented in that matter, the statements concerning the events at the Curve were taken in violation of his right to counsel. As already noted, once this right attaches, and the suspect does not ask for counsel, the police can interrogate a suspect without counsel present provided he validly waives that right. *See Patterson*, 487 U.S. at 290-297. Assuming the right had attached, because Malala did not request counsel, and because he validly waived his rights—Malala was given *Miranda* warnings and signed a waiver—there was no constitutional bar to the interrogation. *Id.*

---

[1] When *Jackson* is invoked, however, it prohibits further interrogation for only the same offenses. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). For a further discussion on what constitutes a same offense, *see infra* II.B.

 Furthermore, even had Malala not waived his rights, the police officers were not precluded from asking Malala questions concerning a different offense from the one in which he was represented. The right to counsel, unlike the right against self-incrimination, only applies to crimes that constitute the same offense. *Compare McNeil*, 501 U.S. at 175 ("The [right to counsel] is offense-specific."), *with Roberson*, 486 U.S. at 684 (Because of the privilege against self-incrimination, a "suspect's request for counsel should apply to any questions the police wish to pose"). "[T]he definition of an 'offense' is not necessarily limited to the four corners of a charging instrument." *Cobb*, 532 U.S. at 173. Relying on its Double Jeopardy jurisprudence, the United States Supreme Court has held that "when the . . . right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the [*Blockburger v. United States*, 284 U.S. 299 (1932)] test." *Id.* The Court rejected, as applied by various lower courts, an expansive exception to the offense-specific definition "for crimes that are 'factually related' to a charged offense." *Id.* at 168.

Therefore, Malala's right to counsel did not apply to the interrogation concerning the events at the Curve. Malala was on parole after having entered a plea of guilty to stealing, A.S.C.A. § 46.4103, in June 2001. In that matter, Malala was represented by the public defender ("PD"). He now asserts that this representation extended to his detention for the probation violation. We assume without deciding that this is true. Nonetheless, the interrogation in this case dealt with the incident at the Curve, and not with Malala's probation violation. Applying the *Blockburger* test to determine whether the two offenses are the same for purposes of the right to counel, it is clear that a probation violation "requires proof of a fact which [the offenses that arose out of the incident at the Curve] do[] not." *Cobb*, 532 U.S. at 173 (quoting *Blockburger*, 284 U.S. at 304; *see Avants*, 278 F.3d at 517 n.5. *Compare* A.S.C.A. § 46.2209 (requiring violation of condition of probation), *with* A.S.C.A. 46.4203 (requiring the carrying of a concealed weapon), A.S.C.A. § 46.4221 (requiring possession of arms without a license), *and* A.S.C.A. § 46.4231 (requiring discharge of arms).[2]

## C. Voluntariness

 Finally, Malala argues that his confession was not voluntary. Even if a suspect waives his *Miranda* rights, a court must still determine whether his confession was voluntary and not obtained under the due process of law. AM. SAMOA REV. CONST. art. I, § 2; U.S. CONST. amend

---

[2] It seems that the offenses in this case would not even be considered "closely related" under the test proposed by the dissent in *Cobb*. *Cobb*, 532 U.S. at 186-87 (Breyer, J., dissenting).

XIV; *see Withrow v. Williams*, 507 U.S. 680, 688-89 (1993); *Colorado v. Connelly*, 479 U.S. 157, 163 (1986); *Miller v. Fenton*, 474 U.S. 104, 109-110 (1985); *People v. Massie*, 967 P.2d 29, 46 (Cal. 1998). Our determination is based on the totality of the circumstances. *See Williams*, 507 U.S. at 688-89.

> Those potential circumstances include not only the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.

*Id.* at 693-94 (1993) (citations omitted). Also, voluntariness is determined by "whether the confession was extracted by any sort of threats or violence, [or] by any direct or implied promises, however slight, [or] by the exertion of any improper influences." *United States v. Braxton*, 112 F.3d 777, 780 (4th cir. 1997) (internal quotations omitted). A confession is not voluntary if any of these circumstances show that "the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* (internal quotations omitted).

Given our findings of facts, we hold that Malala's statement was indeed voluntary. The police officers did not use physical threats or violence, nor did they induce Malala. Furthermore, Malala made no claims, nor does the evidence support any, concerning other factors, such as age, education, or location of interrogation.

## Conclusion

For the reasons stated above, the motion to suppress is denied.

It is so ordered.