Filed:  June 3, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 96-4242
(CR-95-175)

United States of America,

Plaintiff - Appellant,

versus

James Braxton,

Defendant - Appellee.

O R D E R

The Court amends its opinion filed May 6, 1997, as follows:

On page 13 -- the first sentence in Section IV is corrected to begin:  "Because the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising . . . ."

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                    No. 96-4242

JAMES BRAXTON,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
Elizabeth V. Hallanan, District Judge.
(CR-95-175)

Argued: April 8, 1997

Decided: May 6, 1997

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Williams wrote
the majority opinion, in which Chief Judge Wilkinson and Judges
Russell, Widener, Wilkins, Niemeyer, Hamilton, and Luttig joined.
Judge Michael wrote a concurring opinion. Judge Motz concurred in
part III of the opinion and in the judgment. Judge Hall wrote a dis-
senting opinion. Judge Murnaghan wrote a dissenting opinion.

_____

COUNSEL

ARGUED: Rebecca A. Betts, United States Attorney, Charleston,
West Virginia, for Appellant. Edward Henry Weis, First Assistant

Federal Public Defender, Charleston, West Virginia, for Appellee.
**ON BRIEF:** Margaret A. Hickey, Assistant United States Attorney, Charleston, West Virginia, for Appellant. Hunt L. Charach, Federal Public Defender, Charleston, West Virginia, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

James Braxton purchased twenty-nine guns within the span of eight weeks in late 1993. In July 1994, after learning of Braxton's series of gun purchases, the Bureau of Alcohol, Tobacco & Firearms (ATF) initiated an investigation. In August 1994, ATF Special Agent Kay Poynter and West Virginia State Trooper Tom Ballard interviewed Braxton about the gun purchases. The interview, which took place around the kitchen table in Braxton's mother's home, lasted about an hour. During the interview, Braxton made what amounted to a confession. Braxton subsequently was indicted by a grand jury sitting in Charleston, West Virginia, on seven counts of knowingly making false statements in connection with the purchase of firearms in violation of 18 U.S.C.A. § 924(a)(1)(A) (West Supp. 1997). Prior to trial, he moved to suppress the statement he made during the interview with Agent Poynter and Trooper Ballard. The district court granted Braxton's motion, determining that the statement was involuntary and ordering that it be suppressed. We granted en banc review of this case to consider the Government's appeal of the district court's order. For the reasons that follow, we hold that Braxton's statement was voluntary and that the district court erred in suppressing it. Accordingly, we reverse.

I.

Through the receipt of several firearms forms, ATF agents discovered that Braxton had purchased multiple firearms. ATF Special Agent Kay Poynter attempted to locate Braxton so that she could question him about the purchases. After failing to locate him, she asked West Virginia State Trooper Tom Ballard to assist her. Ballard contacted Braxton on August 4, 1994, told Braxton that he and an

2

ATF agent wanted to talk with him about his firearms purchases, and asked Braxton if he would meet them at the local police station. Braxton declined to meet them at the police station, but suggested that they meet the next day at "his mom's house," where he lived.

Arriving at Braxton's mother's home for the interview, the law enforcement officers displayed their badges to Braxton and explained that they "needed" to talk to him about his firearm purchases. Braxton permitted them to enter the home and invited them to sit at the kitchen table. Braxton's mother's boyfriend was initially present in the home and shortly after he left, Braxton's sister arrived. The officers did not inform Braxton of his right to remain silent, nor did they tell him that he was required to answer their questions. During the interview, Braxton admitted that he had purchased firearms for a third party. He also complied with the officers' request that he provide them with a picture of himself.

The district court enunciated three independent rationales for finding that Braxton's statement should be suppressed as involuntary. First, the district court held that the confession was involuntary because Agent Poynter and Trooper Ballard told Braxton that they "needed" to talk to him, rather than that they "would like" to talk to him. As support for this holding, the district court determined that Braxton's "comment that he felt intimidated in the presence of the two law enforcement officers was a credible statement." (J.A. at 160.) Second, the district court found that Trooper Ballard told Braxton "that he was not `coming clean' and that he could face five years jail time as a result." (J.A. at 161.) The district court construed this statement to be both a threat and an implied promise, and concluded that the Trooper's statement rendered Braxton's confession involuntary. Finally, the district court held that the confession was involuntary because Agent Poynter and Trooper Ballard failed "to advise [Braxton] as to why they `needed' to question him or tell him of the possible consequences he faced as a result of answering their questions." (J.A. at 161.) Although the district court acknowledged that Braxton was not in custody, the court nevertheless concluded that his statement was involuntary.

II.

The admissibility of Braxton's statement turns on whether the statement was voluntary under the Fifth Amendment which guaran-

3

tees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. amend. V; accord Malloy v. Hogan, 378 U.S. 1, 7 (1964) (holding that when "a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the [C]onstitution of the United States commanding that no person `shall be compelled in any criminal case to be a witness against himself'" (quoting Bram v. United States, 168 U.S. 532, 542 (1897))). A statement is involuntary under the Fifth Amendment only if it is "involuntary" within the meaning of the Due Process Clause. See Oregon v. Elstad, 470 U.S. 298, 304 (1985) (citing Haynes v. Washington, 373 U.S. 503 (1963); Chambers v. Florida, 309 U.S. 227 (1940)). The test for determining whether a statement is voluntary under the Due Process Clause "is whether the confession was `extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (alterations in original) (quoting Bram, 168 U.S. at 542-43). In Colorado v. Connelly, 479 U.S. 157 (1986), the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause." Id. at 167.

The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. The proper inquiry "is whether the defendant's will has been `overborne' or his `capacity for self-determination critically impaired.'" United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). Any statement given freely and voluntarily without any compelling influences is admissible in evidence. See Miranda v. Arizona, 384 U.S. 436, 478 (1966). The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972).

To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider "the `totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the

4

interrogation." Pelton, 835 F.2d at 1071 (quoting United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980)); accord Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam) (holding that "a finding of coercion and involuntariness must be based upon a careful consideration of the totality of the circumstances" (citing Schneckloth, 412 U.S. at 226)); see also Haynes, 373 U.S. at 513-14 (noting that appellate court must review the totality of circumstances surrounding the statement). On review, "[a]n appellate court must make an independent determination on the issue of voluntariness," while accepting "the district court's findings of fact on the circumstances surrounding the confession . . . unless clearly erroneous." Pelton, 835 F.2d at 1072 (citations omitted). We address in turn each of the district court's three rationales for suppressing Braxton's statement.

A.

First, the district court erred in determining that the officers unlawfully interrogated Braxton because they told him when they arrived at his mother's home "that they `needed' to ask him some questions, rather than saying they `would like' to ask him some questions, because of the insinuation that if they `needed to ask,' [Braxton] `needed to answer.'" (J.A. at 160.) The officers' use of the colloquial phrase "we need to talk to you" simply does not constitute coercive police conduct. The district court's determination that the statement obligated Braxton to answer their questions is unwarranted. There is absolutely no evidence that the officers told Braxton that he was obligated to speak with them. Indeed, the district court itself expressly determined that the officers did not tell Braxton that he was required to answer their questions.

The district court also stated that it "observed [Braxton's] demeanor while he was testifying and concluded that his comment that he felt intimidated in the presence of the two law enforcement officers was a credible statement." (J.A. at 160.) Although we usually decline to overturn a district court's factual determination founded on a witness's demeanor and credibility, see United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987), we attach little significance to Braxton's testimony that he felt intimidated in the presence of Poynter and Ballard. Subsequent testimony by an accused about his prior subjec-

5

tive mental impressions and reactions must be carefully scrutinized, as such testimony is "always influenced by [his] self-interest." Wertz, 625 F.2d at 1136 (citing United States v. Robertson, 582 F.2d 1356, 1366-67 (5th Cir. 1978) (en banc)). Here, there is no evidence in the record -- other than Braxton's self-serving testimony -- to establish that the officers were so intimidating and overpowering that Braxton's will to resist was overcome. Indeed, it would be hard to imagine a more routine, benign, and noncoercive investigatory scenario: Braxton was not under arrest, the pre-arranged interview took place in his mother's home with others present, the interview lasted only an hour, Braxton appeared at all times to be acting cooperatively and voluntarily, and he was not taken into custody even after the interview.

B.

Second, the district court erred in determining that Trooper Ballard's "you're not coming clean" statement constituted coercive police conduct that rendered the confession involuntary. In coming to this conclusion, the district court relied exclusively on Braxton's testimony on the subject, which consisted entirely of the following:

> Officer Ballard said if -- he stated, "If you're not coming clean, you can, you can get five, you know, you can do five years because you're not coming clean." He kept on saying, "You're not coming clean, you're not coming clean."

(J.A. at 120.) Based on this testimony, the district court held that Trooper Ballard's statement to Braxton that he could face five years in jail was both a threat and an implied promise.

The Government argues

> that informing a suspect that he faces jail time or a reference to the maximum penalty for the offense does not render a confession involuntary. See, e.g., United States v. Sablotny, 21 F.3d 747, 752-53 (7th Cir. 1994) (suspect threatened with specter of jail); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992) (suspect was advised that he faced ten years in jail). A suggestion to [a] defendant that he "come clean" is more truthful than coercive.

6

(Appellant's Br. at 8.) We have previously stated that "`a law enforcement officer may properly tell the truth to the accused.'" Pelton, 835 F.2d at 1072 (quoting United States v. Williams, 479 F.2d 1138, 1140 (4th Cir. 1973)). Indeed, "[t]ruthful statements about [the defendant's] predicament are not the type of `coercion' that threatens to render a statement involuntary." Id. at 1073. At the time of the interview, Braxton was being investigated for making a false statement on a firearms record. The maximum statutory penalty for making a false statement on a firearms record is, as Trooper Ballard correctly stated, five years. See 18 U.S.C.A. § 924(a)(1)(A) (West Supp. 1997).

Braxton contends that Trooper Ballard's statement "that you can do five years because you're not coming clean" was not a truthful statement because he presently faces five years because he did "come clean," i.e., because he confessed to making false statements on firearms records, and, as a result, was indicted. Even if Trooper Ballard's statement was not an accurate appraisal of the potential consequences of making a false statement on a firearms record, it was a truthful statement about the potential consequences of making a false statement to law enforcement officers during an investigatory interview. See 18 U.S.C.A. § 1001 (West Supp. 1997) (stating that maximum statutory penalty for making false statements is five years). Admonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty under 18 U.S.C.A. § 1001 for making false statements does not constitute coercive police conduct rendering a statement involuntary. See Rivers v. United States, 400 F.2d 935, 943 (5th Cir. 1968) (holding that postal inspector's reference to 18 U.S.C.A. § 1001 during a custodial interview was not coercive but "merely emphasized that if Appellant was going to say anything, he had best tell the truth"). Neither Poynter nor Ballard intimated to Braxton that he had a duty to speak, only that if he spoke he was required to do so truthfully. As the record reveals, Trooper Ballard believed that Braxton was not speaking truthfully; in other words, that he was not "coming clean."

Braxton argues that whether construed as a reference to the five-year penalty for making false statements on a firearms record, or as a reference to the five-year penalty for making false statements to law enforcement officers during an investigatory interview, Trooper Ballard's "coming clean" statement was misleading because is was not

7

"the whole truth." Ballard's statement was not the "whole truth," Braxton contends, because, after admonishing Braxton to "come clean," Ballard failed to inform Braxton that he had the right, under the Fifth Amendment, to refuse to speak. Whenever a law enforcement officer suggests to a suspect that he tell the truth or face consequences, Braxton argues, he must also inform the suspect that he has the right to remain silent. Because Trooper Ballard failed to give such a warning, Braxton contends, the statement was coercive and rendered Braxton's confession involuntary.

Braxton's argument is far-reaching. It would, in effect, require Miranda warnings in all investigatory scenarios-- whether custodial or noncustodial. We decline to extend the reach of Miranda so far. "In order for Miranda warnings to be necessary, the defendant must be in a custodial situation, and the statements must be made while the defendant is being interrogated." United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993); see also Miranda v. Arizona, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."). The Supreme Court has "stressed that it was the custodial nature of the interrogation which triggered the necessity . . . of its Miranda holding." Beckwith v. United States, 425 U.S. 341, 346 (1976); accord United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987) (stating that Miranda warnings are not required in noncustodial interrogations). Here, it is not disputed that Braxton was not in custody when he made the inculpatory statement to Agent Poynter and Trooper Ballard. At the interview, Braxton freely consented to answer the officers' questions. He was not subjected to coercive police action, either in word or deed. He was at liberty to terminate the discussion and ask the officers to leave at any time. The interview took place on his turf, at his mother's home. Accordingly, Trooper Ballard's statement was not a threat that rendered Braxton's confession involuntary.

The district court also found that Trooper Ballard's statement constituted an implied promise that "if you `come clean,' you will not be prosecuted." Specifically, the district court stated that Braxton "could easily have inferred from the statement that if he did `come clean' he would not face jail time and that answering the questions could be to

8

his benefit." (J.A. at 161.) Again, we disagree. A law enforcement officer's admonishment to a suspect during an investigatory interview to tell the truth or face consequences is simply not an implied promise of non-prosecution. The district court clearly erred in drawing that implication from Trooper Ballard's statement.

Even if the district court did not err in determining that Trooper Ballard's statement was both a threat and an implied promise, the court erred in concluding that the mere existence of the threat and implied promise rendered Braxton's confession involuntary. The existence of a threat or an implied promise does not automatically render a confession involuntary. The proper inquiry is whether the confession was "extracted" by the threats or implied promises, "however slight." See Hutto, 429 U.S. at 30. For a threat or an implied promise to invalidate a defendant's statement, "the pressure, in whatever form [or `however slight'], [must be] sufficient to cause the petitioner's will to be overborne and his capacity for self-determination to be critically impaired." Ferguson, 566 F.2d at 877 (citing Columbe v. Connecticut, 367 U.S. 568, 602 (1961)); accord Pelton, 835 F.2d at 1071.

Here, considering the totality of the circumstances, Trooper Ballard's statement to Braxton that he could face five years in jail was neither a threat that overpowered Braxton's will to resist, nor an implied promise that he could not refuse. Cf. United States v. Sablotny, 21 F.3d 747, 752 (7th Cir. 1994) (holding that police detective's statement to defendant that "she would probably go to jail" if she did not cooperate did not render her confession involuntary); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992) (holding that Customs official's statement to defendant that "if you don't cooperate with us, ten years can be a long time in jail" did not render defendant's confession involuntary). Even if the statement influenced Braxton's decision to confess, the voluntariness of the confession "is not . . . `to be equated with the absolute absence of intimidation,' for under this test virtually no statement would be voluntary." Pelton, 835 F.2d at 1072 (quoting Wertz, 625 F.2d at 1134).

9

C.

Third, the district court erred in determining that Braxton's confession was involuntary because the officers failed to tell him of the charges they were investigating. Although Braxton knew that the officers wanted to discuss his series of gun purchases and that Poynter was an ATF agent, he apparently was not aware of all of the possible offenses related to the purchases. While courts may consider whether the defendant knew the nature of the offense under investigation in determining voluntariness, see 18 U.S.C.A. § 3501(b)(2) (West 1985), Agent Poynter and Trooper Ballard had no duty to advise Braxton of the identity of the specific offense under investigation. See United States v. Olmstead, 698 F.2d 224, 226-27 (4th Cir. 1983) (holding that law enforcement officers have no duty to inform suspects of the nature of the crime being investigated unless the suspect asks and failing to tell would be misleading); United States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987) ("Silence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."); see also Colorado v. Spring, 479 U.S. 564, 577 (1987) (holding in custodial interrogation case that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege" (emphasis added)).* We would impose a substantial burden on law enforcement operations if we required investigating officers in noncustodial, investigatory interviews to inform suspects of every potential theory of liability related to the suspect's conduct at issue. In light of the fact that such suspects may simply

_____

* Moreover, although courts may consider whether the defendant was advised of his Miranda rights in determining voluntariness, see 18 U.S.C.A. § 3501(b)(3) (West 1985), Agent Poynter and Trooper Ballard had no duty to advise Braxton of his right against self-incrimination. The interview with Braxton was noncustodial. See Miranda v. Arizona, 384 U.S. 436, 477-78 (1966); United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987) (noting that in noncustodial interrogations, "the absence of Miranda warnings is one `factor' to be considered in assessing the voluntariness of a confession"); United States v. Locklear, 829 F.2d 1314, 1316 (4th Cir. 1987) (agent's failure to give defendant Miranda warnings during noncustodial interrogation "does not require that [the defendant's] remarks be suppressed").

10

refuse to answer questions and then seek legal counsel, we are loath to impose such a burdensome duty on investigating officers.

After thoroughly reviewing the circumstances surrounding the interview at Braxton's mother's house, we can find no evidence that Agent Poynter or Trooper Ballard used any technique or method that would offend due process. The officers did not harm or threaten to harm Braxton if he did not answer their questions. See, e.g., Beecher v. Alabama, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); Payne v. Arkansas, 356 U.S. 560, 564-65 (1958) (statement obtained after police threatened to turn suspect over to an angry mob); Brown v. Mississippi, 297 U.S. 278, 281-82 (1936) (statement obtained after police whipped suspect). The officers did not deprive Braxton of anything. See, e.g., Malinski v. New York, 324 U.S. 401, 403, 406-07 (1945) (statement obtained after forcing suspect to remain naked); Reck v. Pate, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); Brooks v. Florida, 389 U.S. 413, 414-15 (1967) (statement obtained after depriving suspect of food and keeping suspect naked in a small cell). The officers did not subject Braxton to a lengthy period of interrogation or isolation. See, e.g., Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) (statement obtained after interrogating suspect virtually nonstop for thirty-six hours); Davis v. North Carolina, 384 U.S. 737, 752 (1966) (statement obtained after isolating suspect for several weeks). And, as we have explained, the officers did not try to deceive Braxton. See, e.g., Spano v. New York, 360 U.S. 315, 323 (1959) (statement obtained after suspect erroneously told that a friend, who had three children and a pregnant wife, would lose his job); Leyra v. Denno, 347 U.S. 556, 559-61 (1954) (statement obtained after hours with psychiatrist trained in hypnosis, although suspect erroneously told that doctor was a general practitioner). In short, we cannot find the kind of coercive police conduct that is necessary to render Braxton's statement involuntary under the Due Process Clause. The district court therefore erred under each of its stated rationales in determining that Braxton's confession was involuntary.

III.

In addition to erring under all three of these specific rationales, the district court also erred by failing to consider the "totality of the cir-

11

cumstances." Cf. United States v. Dodier, 630 F.2d 232, 236 (4th Cir. 1980) (stating that "[t]he district court's resolution of the credibility issues are fully supported by the record," but holding that the court's "conclusion that the totality of the circumstances proved the confession involuntary . . . was clearly erroneous"). Specifically, the district court failed to sufficiently consider "the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). Braxton was interviewed by law enforcement officers around the kitchen table in his mother's home. During the interview, at least one family member and one family friend were permitted to come and go freely. Cf. United States v. Olmstead, 698 F.2d 224, 227 (4th Cir. 1983) (confession not involuntary where "interview was conducted in [the defendant's] home in the presence of his wife"); United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980) (confession not involuntary where defendant made statement "in the very area where he lived and had many friends and relatives who quickly gathered around him"). He had previously agreed to the meeting, and he permitted the officers to enter the home after they told him they needed to talk to him about his firearm purchases. The district court acknowledged that the interview was not custodial and that Braxton was never told that he was required to answer the officers' questions. Furthermore, Braxton was not questioned for an extended period, nor was he subject to incommunicado interrogation. In its entirety, the interview lasted approximately one hour. Cf. United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987) (confession not involuntary where "the interviews were not an exercise in endurance" and"[t]he longest meeting lasted approximately two hours"). Finally, there is nothing in the record -- such as youth, diminished mental capacity, or intoxication -- to suggest that Braxton was especially susceptible to police coercion. Cf. Pelton, 835 F.2d at 1073-74 (defendant's personal characteristics did not support his claim that he was coerced into confessing); Locklear, 829 F.2d at 1317 (confession not involuntary where defendant's "perception of events was at no time impaired by the influence of drugs or alcohol"); see also United States v. Seni, 662 F.2d 277, 282 (4th Cir. 1981) (holding in custodial interrogation case that defendant's statement was voluntary where defendant did "not allege that a lack of education, maturity, or intelligence deprived him of the ability to choose to remain silent").

At oral argument, instead of considering the totality of the circumstances, counsel for Braxton focussed on Trooper Ballard's single

12

statement to Braxton that he was not "coming clean." He argued that Trooper Ballard's "coming clean" statement, <u>standing alone</u>, amounted to government coercion sufficient to render Braxton's confession involuntary. In applying the totality of the circumstances test, however, courts should not focus on a single factor in determining voluntariness. In <u>Seni</u>, 662 F.2d at 277, a custodial interrogation case, we stated that voluntariness is "to be determined from `the totality of all the surrounding circumstances,'" and held that neither the drawing of a gun by the interrogating officer, nor the handcuffing of the confessor "establish involuntariness in and of themselves." <u>Id.</u> at 281-82 (quotation and citations omitted). Here, Trooper Ballard's "coming clean" statement is much less coercive than drawing a gun on the suspect or handcuffing him -- practices that we held in <u>Seni</u> did not, in and of themselves, establish that the confession was involuntary. <u>Id.</u> Ergo, Trooper Ballard's statement, without more, is simply an insufficient basis for affirming the suppression of Braxton's confession.

IV.

Because the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that "very few incriminating statements, custodial or otherwise, are held to be involuntary." <u>United States v. Rutledge</u>, 900 F.2d 1127, 1129 (7th Cir. 1990). We find that this case is no exception. This is not a case where law enforcement officers "went to extraordinary lengths to extract from [the defendant] a confession by psychological means." <u>Ferguson v. Boyd</u>, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam). Braxton's incriminating statement was elicited without the aid of any coercive conduct on the part of Agent Poynter and Trooper Ballard. Furthermore, nothing in the record so much as suggests that Braxton's "will was overborne." <u>Reck v. Pate</u>, 367 U.S. 433, 440 (1961). As a result, Braxton's statement was voluntary under the Fifth Amendment. Accordingly, the order of the district court suppressing the statement is reversed and the case is remanded to the district court for proceedings consistent with this opinion.

<u>REVERSED AND REMANDED</u>

MICHAEL, Circuit Judge, concurring in the judgment:

I concur in the judgment because I do not believe that the totality of the circumstances reveals that Braxton's will was overborne or that

13

his capacity for self-determination was critically impaired. See United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987).

HALL, Circuit Judge, dissenting:

I join Judge Murnaghan's dissent. I write separately only to emphasize that, in my view, the trooper's "come clean or you'll get five years" threat/promise was plainly false. Braxton had no obligation to say a single word to the authorities, let alone to "come clean," and he could not have been punished for it had he silently shown his inquisitors to the door.

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent from the majority's opinion. Trooper Ballard's threat that Braxton would face five years in jail if he did not "come clean" and confess and his implied promise that Braxton would not face jail time if he did confess were clearly sufficient "to cause [Braxton's] will to be overborne and his capacity for self-determination to be critically impaired." Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977).

I.

The Supreme Court has held that when "a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the [F]ifth [A]mendment to the [C]onstitution of the United States commanding that no person `shall be compelled in any criminal case to be a witness against himself.'" Bram v. United States, 168 U.S. 532, 542 (1897). The constitutional inquiry is not whether the conduct of the officers in obtaining the confession was shocking, but whether the confession was "`free and voluntary.'" Malloy v. Hogan, 378 U.S. 1, 7 (1964) (quoting Bram, 168 U.S. at 542). More specifically, the test for determining whether a statement is voluntary is "whether the confession was `extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (alterations in original) (quoting Bram, 168 U.S. at 542-43). The proper inquiry focuses on

14

whether, as a matter of law, under the totality of the circumstances, "the defendant's will has been `overborne' or his `capacity for self-determination critically impaired.'" United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).

I disagree with the majority opinion's application of those principles in the instant case. Part II.B. of the majority opinion holds that Trooper Ballard's "coming clean" statement did not constitute coercive police conduct. The majority points out that a law-enforcement officer may lawfully tell the defendant the truth. The majority then concludes that Trooper Ballard's statement was not a coercive threat because he merely told Braxton the "truth," namely, that he could serve five years in jail either for making a false statement on a firearms record, see 18 U.S.C.A. § 924(a)(1)(A) (West Supp. 1997), or for making a false statement during an investigatory interview, see 18 U.S.C.A. § 1001 (West Supp. 1997).

It is far from clear, however, that Trooper Ballard's statement that Braxton could "do five years because [he was] not coming clean" referred to either § 924(a)(1)(A) or § 1001. Indeed, the officers did not tell Braxton, nor was Braxton aware, that he was under investigation for making false statements on a firearms record, in violation of § 924(a)(1)(A). The district court reached a plausible conclusion that Trooper Ballard's statement constituted a threat that Braxton would face five years in jail if he did not confess.

Moreover, the district court also reached a plausible conclusion that the statement contained an implied promise that Braxton would not face the same penalty if he did confess. Braxton easily could have inferred from Trooper Ballard's statement that he would not face jail time if he did "come clean" and confess and that answering the questions therefore would be to his benefit. As stated above, the Supreme Court has clearly held that "implied promises, however slight," render a confession involuntary. Ross, 429 U.S. at 30 (emphasis added) (quoting Bram, 168 U.S. at 542-43).

I recognize that we must consider the totality of the circumstances surrounding Trooper Ballard's statement. Nonetheless, even under the totality of the circumstances, I would still hold that Braxton's confes-

15

sion was involuntary. An officer's threat that the defendant will serve five years in jail if he does not confess and an officer's implied promise that the defendant will not serve any time if he does confess clearly are "sufficient to cause the [defendant's] will to be overborne and his capacity for self-determination to be critically impaired." Ferguson, 566 F.2d at 877. Trooper Ballard's threat and implied promise were sufficiently coercive to render Braxton's confession involuntary, even though Trooper Ballard threatened Braxton at home rather than in a police station.

II.

Accordingly, I would affirm the district court's judgment. I dissent.

16