**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-4707**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

OSWIN ABRAHAM,

Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  W. Craig Broadwater, District Judge.  (CR-04-66)

Argued:  September 21, 2006      Decided:  January 22, 2007

Before WILKINSON and DUNCAN, Circuit Judges, and Richard L. VOORHEES, United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Matthew McGavock Robinson, ROBINSON & BRANDT, P.S.C., Cincinnati, Ohio, for Appellant. Paul Thomas Camilletti, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee.  **ON BRIEF:** Robert C. Stone, Jr., Martinsburg, West Virginia, for Appellant.  Thomas E. Johnston, United States Attorney, Wheeling, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant-Defendant Oswin Abraham ("Defendant")challenges his convictions for violations of 21 U.S.C. §841 and 18 U.S.C. §924(c) on multiple grounds. Defendant also challenges his sentence on the substantive drug offense count (Count I) pursuant to United States v. Booker / Fan Fan[1] based upon the sentencing court's findings with respect to relevant conduct. For the reasons stated herein, the convictions and sentence are AFFIRMED.

I.

West Virginia State Police undertook investigation of a shooting that occurred in December of 2003. State Trooper Nathan Harmon ("Harmon") was one of the officers assigned to the investigation. Victims of the shooting reported that the shooter fired at them from a Black Acura automobile. Physical evidence recovered from the scene included shell casings for a 9 millimeter gun.

"Troy Brammah" (a/k/a "Troy Ray Ferguson" or "T") was later identified as a possible suspect by one of the shooting victims. The victim advised the police that the suspect lived in the Wildflower or Wildflower Ridge community but the exact location of Brammah's residence was unknown.

---

[1]United States v. Booker / Fanfan, 125 S.Ct. 738 (2005).

Law enforcement developed a relationship with a confidential informant ("CI" or "Informant") during the investigation. The CI had worked with other law enforcement agencies in the past and began to work directly with Officer Harmon. Reportedly, the informant had known Brammah for approximately two years. The CI knew that Brammah operated several different vehicles, including a Black Acura. The CI advised Harmon that a Haitian who was supposedly with Brammah on the night of the shooting was providing the CI with information. The CI provided details about the shooting that had not been made available to the media and that were consistent with the information provided to Trooper Harmon by one of the victims.

The informant, who knew where Brammah lived because of past dealings, took Harmon to Brammah's residence. The CI had observed Brammah dealing in crack cocaine and had also seen drugs and guns at the residence. The CI told Harmon that Brammah was "heavily involved in drug trafficking" and that he had personally seen approximately 30 to 70 grams of crack cocaine in Brammah's possession. According to the informant, Brammah was known to hide firearms and drugs in a safe within his bedroom closet on the second floor of his residence.

In addition to identifying and observing Brammah's residence while in the presence of the informant, Harmon independently conducted surveillance of the residence on at least one other

occasion.  During the latter event, Harmon observed a Black Acura with Pennsylvania registration in the driveway as well as a White SUV.

On March 4, 2004, at approximately 8:30 pm, Harmon applied for a warrant to authorize the search of Brammah's residence and the Black Acura seen on the premises. He submitted an affidavit in support of the search warrant application. Based upon the affidavit, including information provided by the CI, a search warrant was issued by a Berkeley County Magistrate.  (J.A. at 34-36, 81.)  The warrant authorized the search of the Black Acura as well as the residence.  Harmon and other officers executed the search warrant at the residence at approximately 11:30 p.m. that same evening.  The officers located and seized from one of the bedroom closets a Glock Model 19, approximately 70 grams of crack cocaine, and 40 grams of marijuana.  The bedroom involved was later described as the bedroom opposite Brammah's room.  Officers also discovered 40-caliber ammunition and a 40-caliber magazine.  The Glock pistol was positioned beside two duffle bags which contained the contraband as described below.

Both duffle bags were together on the closet floor. Specifically, the gray duffle bag contained: 70 grams of crack cocaine (in "cookie" form), 40-caliber ammunition in a clear case, clothing, and $1,830 in U.S. currency.  The blue duffle bag contained clothing, a loaded 40-caliber magazine with nine rounds

4

of ammunition, and a cleaning kit for a 40-caliber Glock or Beretta pistol. Four individuals were detained on site as a result of the search of the residence. The search of the residence concluded at approximately 2:44 a.m.

Prior to the search of the residence, around 11:15 p.m., law enforcement officers conducting surveillance of the property had observed the Black Acura leave the residence. Officers followed the vehicle. Around 12:15 am, West Virginia State Police Troopers were directed to stop the Black Acura pursuant to the search warrant. Troopers James Burkhart ("Burkhart") and James Douglas Byrd ("Byrd") were present during the stop.

The stop occurred in a Wendy's parking lot drive-thru. A preliminary search of the Black Acura was conducted in the Wendy's parking lot. Defendant was the driver and sole occupant of the car. He advised the officers that he had a loaded pistol in the glove compartment. The gun turned out to be a .40 caliber Beretta pistol. Defendant was also in possession of approximately $2,000 in U.S. Currency. The car was towed to the police barracks pursuant to the warrant.

Defendant was also detained. It is undisputed that Defendant was "in custody" but had not been placed under arrest. Defendant was transported to the Martinsburg State Police Barracks and held in a processing room. Trooper Byrd maintained watch over Defendant. According to Byrd, there was no attempt by law enforcement to

initiate conversation during transport or during the time Defendant was held in the processing room pending the arrival of Trooper Harmon.

Harmon and Special ATF Agent Doug Dean ("Dean") interviewed Defendant as soon as they had completed the search of the residence and before interviewing any of the other detainees. They advised Defendant that they wanted to ask him about the Black Acura, the pistol in the vehicle, and the evidence recovered from the residence during the search.

Before being questioned, at 3:23 a.m., Defendant signed a waiver of rights form. (J.A. at 41, 148-49.) Defendant had been in custody for approximately three (3) hours. Defendant stated that he and Brammah were cousins; that he had been staying at Brammah's residence for several days; that Defendant was the owner of the 1999 Black Acura and the 40-caliber Beretta pistol found in the glove box of the car; and that he had put the extra magazine for the Beretta in his duffle bag located in an upstairs closet of Brammah's residence. After being asked about the crack cocaine discovered during the search, Defendant asked to phone his mother and was permitted to do so. Immediately following the phone call, Defendant invoked his right to counsel and the interview ceased. The entire interview (up until the phone call) lasted approximately twenty (20) to thirty (30) minutes.

After Harmon interviewed Brammah and the other detainees, Defendant was advised that he was under arrest. By that time, Defendant had been held in custody for approximately five (5) hours. Defendant was later charged in state court with possession with intent to distribute cocaine.

On November 17, 2004, Defendant was named in a three-count Bill of Indictment issued in the Northern District of West Virginia. Defendant was charged with violations of 21 U.S.C. §841, 18 U.S.C. §§924(c) and 922(j). Specifically, the Indictment alleged in Count I that Defendant possessed with intent to distribute 67.1 grams of cocaine base ("crack" cocaine); in Count II that Defendant used and carried a firearm and possessed a firearm in furtherance of the drug trafficking crime charged in Count I; and in Count III that Defendant possessed a stolen firearm. Both of the firearm offenses alleged that the firearm involved was a Glock, Model 19, 9 x 19 mm pistol, serial #AMV-904US.[2]

Defendant exercised his right to jury trial. Trial commenced on February 16, 2005. At the conclusion of the trial, on February 17, 2005, the jury convicted Defendant of Counts I and II of the indictment and acquitted Defendant on Count III.

---

[2]Defendant was not charged with possession of the 40-caliber Beretta.

## II.

Defendant raises the following issues on appeal: 1) Whether the district court erred in denying Defendant's motion to suppress; 2) Whether the district court erred in denying Defendant's motion for judgment of acquittal; 3) Whether the district court abused its discretion in its response to a jury question during deliberations requesting clarification with respect to Count II;  4) Whether the district court abused its discretion in denying defense counsel's request to conduct an individualized voir dire examination of two prospective jurors; 5) Whether the sentence imposed on Count I is reasonable; and 6) Whether the sentencing judge erred by employing a preponderance of the evidence standard in determining relevant conduct. Defendant's arguments are addressed in turn.[3]

## III.

A.   Brammah's Residence Was Searched Pursuant To A Valid & Sufficiently Particular Search Warrant

Defendant challenges the search warrant on several grounds, including lack of indicia of probable cause and lack of particularity in the description of the property to be searched. Defendant also appears to challenge the absence of a nexus between the shooting investigation and the residence searched.

---

[3]Any issues not fully discussed herein are found to have no merit.

8

Our review is limited to considering whether there is a "substantial basis" in the record to support the magistrate's probable cause determination and issuance of the warrant. Illinois v. Gates, 462 U.S. 213, 236 (1983).

The search warrant in this case was supported by indicia of probable cause. Probable cause to search is described as a "fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 230. Probable cause is determined based upon a "totality of circumstances" test and, therefore, turns on "the assessment of probabilities in particular factual contexts." Id.,at 238. Probable cause may be established through information from any reliable source or sources. Draper v. United States, 358 U.S. 307, 313 (1959).

The information provided to Trooper Harmon by the victims and the CI was consistent. The confidential informant, who had known Brammah for 2 years and had proven to be reliable, stated that Brammah was heavily into drug dealing and that he had personally observed drugs and guns within the house. The information provided by the CI was corroborated by Harmon's investigation and independent surveillance. The presence of the Black Acura, assertedly belonging to Brammah, linked the residence to the shooting incident under investigation.

The search warrant was also "sufficiently particular."

The residence was described as follows:

9

The complete interior and exterior of a blue in color, vinyl sided, two story residential home, with an attached rear wooden deck. [T]his residence is described as being located Four houses on right, once entering into a caldasac[sic] off Virgo Lane in the Wildflower Ridge Sub-Division, within the Martinsburg area of Berkeley County. This residence can further be described as having a paved driveway, having contained therein, a black in color Acura and a White in color SUVs[sic], resided by a Mr. Troy Ray Ferguson, his fiancé wht. Female), and a young child.

(J.A. at 36, ¶1) The warrant also authorized the search of the Black Acura and included the following description:

"Any and all contents and storage areas within a black in color Acura, bearing possible PA registration or WV registration, and currently located at the residence listed above."

(J.A. at 36, ¶4)

Defendant's lack of particularity challenge is based in part on discrete inaccuracies within Harmon's description of the residence. For instance, Trooper Harmon admitted that Brammah's residence did not have a rear wooden deck. (J.A. at 102, 104-05.) Harmon had observed the rear of the house from an incline approximately 300 to 400 yards away and saw a wooden gate which appeared to be a wooden deck. The mention of a rear wooden deck can be attributed to "human error" based upon Trooper Harmon's observation. The parties' disagreement regarding the true color of the residence does not create a problem either as a person's description of color is somewhat subjective. Harmon simply

10

disagreed with defense counsel's description of the house color (grey rather than blue).

Furthermore, the fact that Trooper Harmon inaccurately described the address does not render the search warrant invalid. United States v. Owens, 848 F.2d 462, 463 (4th Cir.1988) (upholding warrant and search even though the address identified provided an address / apartment number that did not exist where officers relied on common sense and reliable information known to them outside the four corners of the warrant and affidavit to ascertain residence to be searched). Harmon explained that while the address he provided within his affidavit was "52 Virgo Lane," he later learned that the cul-de-sac where the house was located had a missing or damaged street sign and was actually called "Pluto Place," making the correct address 52 Pluto Place. Virgo Lane was adjacent to Pluto Place.

Similarly, Defendant contends that Harmon's affidavit erroneously identified Brammah by his alias of "Troy Ferguson" and asserts that Harmon should have taken additional steps to try to identify the owner of the Black Acura. To uphold the search warrant and subsequent search(es), it is not necessary for the court to find that law enforcement had exhausted all of its conceivable investigatory resources before applying for the search warrant. It is sufficient if the information presented in support of the warrant application points in a significant way to a

connection between the target of the investigation and the place or items to be searched.

In addition, we are satisfied that a sufficient nexus existed between the shooting investigation and the subjects of the search warrant. *See* <u>United States v. Anderson</u>, 851 F.2d 727, 729 (4th Cir.1988)(U.S. Constitution requires a sufficient nexus between the criminal conduct, items to be seized, and the place to be searched). It is true that Harmon did not observe any illegal activity occurring at the house. The fact that Harmon learned that the shooting suspect (previously known only as "Troy" or "T") lived there, combined with the presence of the alleged shooter's vehicle on at least 2 occasions, provides a sufficient nexus. <u>United States v. Lalor</u>, 996 F.2d 1578 (4th Cir.1993) ("the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched.") Here, it would have been logical to believe that the items to be seized - particularly the gun allegedly used in the shooting - might be found in the residence or in the Black Acura.

Finally, notwithstanding any supposed error within Trooper Harmon's affidavit, the search warrant is valid pursuant to the good faith exception enunciated in <u>United States v. Leon</u>, 468 U.S. 897, 920 (1984). The good faith exception may be recognized "when an officer acting with objective good faith has obtained a search

12

warrant from a judge or magistrate and acted within its scope."
Id.; United States v. Perez, 393 F.3d 457 (4th Cir.2004) (reversing
district court's decision granting motion to suppress and finding
that good faith exception cured the problems raised regarding the
search warrant). There was abundant evidence to support the
officer's objective good faith belief that the search warrant was
well grounded. Under such circumstances, the good faith exception
applies.

   B. The Pre-Arrest Seizure Of Defendant Pursuant To A Search
   Warrant Authorizing The Search & Seizure Of His 1999 Black
   Acura Was Reasonable

Defendant moved to suppress physical evidence as well as his
subsequent statements to law enforcement on the grounds that he was
subject to an unreasonable seizure when law enforcement detained
him pursuant to the search warrant for his car. Defendant
challenges the district court's denial of his motion to suppress.

With respect to the suppression decision, the district court's
factual findings are reviewed for clear error and the legal
conclusions are reviewed *de novo*. United States v. Simons, 206
F.3d 392, 398 (4th Cir.2000).

The district court's analysis was brief, commenting only that
if Defendant had been taken back to the house pending completion of
the search, "there would be little doubt that the detention was
permissible." (J.A. at 72.) *See* Michigan v. Summers, 452 U.S. 692

13

(1981).  Applying a totality of the circumstances test, the district court upheld the seizure.

In Michigan v. Summers, a pre-arrest seizure of a resident of the house subject to a search warrant was upheld based on 1) law enforcement's interest in preventing flight in the event that incriminating evidence is found; and 2) the existence of a search warrant.[4]  Summers, 452 U.S. at 702-03.  The Supreme Court recognized that "some seizures admittedly covered by the Fourth Amendment constitute such *limited intrusions* on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity."  Id. at 699 (*emphasis added*).  Both the nature of the "articulable facts" supporting detention and the law enforcement interest are relevant.  The Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Id., at 705.

---

[4]In the instant case, because a valid search warrant had been issued authorizing the seizure of Defendant's car  (as well as the search of the residence where he had been temporarily residing), a Terry v. Ohio reasonable suspicion inquiry is not required and United States v. Brown is not controlling.  United States v. Brown, 401 F.3d 588 (4th Cir.2005).  For the same reason, we need not decide whether, or at what point, probable cause to arrest Defendant may have existed.

14

One might argue that Summers is distinguishable from the facts here because although Defendant was seen leaving the residence immediately prior to execution of the search warrant, he was not detained on the premises of the residence. Therefore, the question presented is whether the pre-arrest detention of Defendant at the police barracks, as opposed to the residence that was the subject of the search warrant, renders the seizure unconstitutional.

On these facts, we find the actual location of Abraham's detention inconsequential. The existence of the search warrant for Defendant's car, Defendant's physical presence in the Black Acura at the time the warrant was executed, the fact that car and driver were already mobile, and the tight time frame between the significant events - issuance of the warrant, Defendant's departure from the residence, and the actual vehicle stop - bring this case within the rationale and holding of Summers.[5] The search warrant was executed during the late evening and early morning hours. Legitimate concerns such as officer safety, and the desire to prevent Defendant from communicating with the other detainees at the residence weigh in favor of upholding the seizure. It is also noteworthy that Defendant was merely moved to the same location as his car. The close proximity between the actual location of the

---

[5]Indeed, the Government agreed during oral argument that if a Black Acura not been expressly identified within the search warrant, its argument would be on "shaky ground."

15

seizure and the local police barracks also weigh in favor of upholding the district court's ruling.[6]

For all of these reasons, we affirm the district court on this issue.

C.  Appellant's Statements To Law Enforcement Were Voluntary

Despite his written *Miranda*[7] waiver, Defendant also contends that his oral statements to law enforcement were involuntary. According to Defendant, the statements he made during the interview to Troopers Harmon and Dean should have been suppressed pursuant to the dictates of the Fifth Amendment.[8]  We disagree since Defendant's claim has no support in the record.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law."  U.S. Const. amend. V; United States v. Braxton, 112 F.3d 777, 780 (4th Cir.1997)(*en banc*); Moran v. Burbine, 475 U.S. 412, 424 (1986) (*Miranda* warning is a measure to insure that a suspect's right against compulsory self-incrimination is protected)(*internal citations omitted*).  "A

---

[6]It was established during trial that the police barracks was approximately 2 - 2 ½ miles from Brammah's residence. During oral argument, the Government stated that the Wendy's was even closer, approximately 3/4 of a mile from the police barracks.

[7]Miranda v. Arizona, 384 U.S. 436 (1966).

[8]Defendant does not appear to challenge admissibility of the statements made during the actual vehicle stop.  According to the law enforcement witnesses, Defendant volunteered the information about the gun in the glove compartment.

16

statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." Braxton, 112 F.3d at 780 *(internal citations omitted)*. "The test for determining whether a statement is voluntary under the Due Process Clause "is whether the [statement] was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Braxton, 112 F.3d at 780 (*quoting* Hutto v. Ross, 429 U.S. 28, 30 (1976)). In other words, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Id. (*quoting* Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

In determining voluntariness, the Court employs a "totality of the circumstances" inquiry, including examination of the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. Braxton, 112 F.3d at 781 (*citing* United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir.1987)); United States v. Elie, 111 F.3d 1135, 1143-44 (4th Cir.1997).

Defendant's claim of involuntariness has no support in the record. There is no indication that the delay between the time Defendant was initially detained and the time of interview was significant in any way. Rather, as soon as the search of the residence was complete, Trooper Harmon interviewed the Defendant.

17

Likewise, Defendant does not claim that the *Miranda* warnings were deficient or unclear in any way. Indeed, both Harmon and Dean testified that Abraham signed the waiver of rights form and answered the questions posed without hesitation. Defendant Abraham was also allowed to phone his mother as soon as he requested to do so. The fact that he knew how to terminate the interview and invoke his right to counsel indicates an awareness and understanding of his rights and, therefore, supports our finding. Most importantly, there is no evidence, nor any allegation, of any coercive police conduct.

The fact that Defendant was detained and questioned at the police barracks does not require a different result. While the police barracks may be a somewhat more intimidating environment than a residence, an interrogation does not have to be free from any vestige of intimidation in order for the statements provided to be deemed voluntary. Braxton, 112 F.3d at 782.

Moreover, even if we found that Defendant was subject to an illegal seizure, Defendant's waiver of his *Miranda* rights was sufficient to purge any taint resulting from the Fourth Amendment violation. Brown v. Illinois, 422 U.S. 590 (1975)(evidence obtained as a result of an illegal arrest in violation of the Fourth Amendment must be suppressed); Dunway v. New York, 442 U.S. 200 (1979) (relevant factors - temporal proximity of arrest and confession, presence of intervening circumstances, and the purpose

18

and flagrancy of the official misconduct).  If a "taint" analysis were required, the same facts would be relevant:  the brevity of the interview, the fact that Abraham was allowed to go to the bathroom immediately prior to beginning the interview, the purpose of his illegal detention, namely, to secure him in the event incriminating evidence turned up during the search of the house or car, and the absence of any flagrant police misconduct. Defendant's argument on this issue fails.

D.  Defendant's Motion For Judgment Of Acquittal Was Properly Denied

Defendant also contends that the district court erred in denying his motion for judgment of acquittal.  More specifically, Defendant asserts that the Government failed to produce evidence from which a reasonable jury could find that Defendant had constructive possession of the crack cocaine and Glock pistol.  We disagree.

The district court's denial of Defendant's Rule 29 motion for judgment of acquittal is reviewed *de novo*.  United States v. Gallimore, 247 F.3d 134, 136 (4th Cir.2001).  A motion for judgment of acquittal is ill-founded where the evidence, viewed in the light most favorable to the Government, is sufficient to support the verdict.  Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Moye, 454 F.3d 390, 394 (4th Cir.2006)(*en banc*).

Possession may be actual, constructive or joint.  Gallimore, 247 F.3d at 136-37; United States v. Rusher, 966 F.2d 868, 878 (4th

19

Cir.1992). In order to establish constructive possession, the Government had to produce evidence showing "ownership, dominion, or control over the contraband itself or the premises . . . in which the contraband is concealed." United States v. Blue, 957 F.2d 106, 107 (4th Cir.1992)(*quotations and citation information omitted*). Discovery of contraband at a defendant's home "permits an inference of constructive possession." United States v. Shorter, 328 F.3d 167, 172 (4th Cir.2003).

Viewing the evidence in the light most favorable to the Government, we find that sufficient evidence was presented from which a reasonable jury could find that Defendant had constructive possession of the drugs and Glock pistol. In this case, circumstantial evidence was presented indicating that the bedroom where the duffle bags were found was being used by the Defendant.[9] Although there were other occupants of the residence, evidence was presented that the cocaine and pistol were found with Defendant's personal possessions. Defendant admitted to Trooper Harper and Agent Dean that the extra magazine for his 40-caliber Beretta could be found in his duffle bag in an upstairs bedroom closet at Brammah's house - the same bags containing contraband. As already noted, both of the duffle bags were found immediately adjacent to the Glock firearm, both bags contained 40-caliber ammunition, and

_____

[9]Reportedly, the other bedroom upstairs was Brammah's, and another occupant, Whitney Nesbit, was using a downstairs room as a bedroom.

the gray duffle bag contained crack cocaine. Defendant's statements, along with the proximity of these items to each other, give rise to an inference that all of the objects in both bags either belonged to, or were under the control of, the Defendant. The fact that Defendant was not physically at the house when the cocaine and Glock pistol were found is not determinative.

As for Defendant's §924(c) conviction, sufficient evidence was presented that the Glock pistol was possessed by the Defendant "in furtherance of the drug trafficking crime" alleged in the indictment. The type of firearm and proximity of the weapon in relation to the crack cocaine provide the evidentiary bases for the jury's verdict on Count II. <u>United States v. Lomax</u>, 293 F.3d 701 (4th Cir.2002)(identifying factors indicating a connection between defendant's possession of a firearm and his drug trafficking activity); *See generally*, <u>United States v. Ceballos-Torres</u>, 218 F.3d 409, 412 (5th Cir.2000).

E. The District Court Did Not Abuse Its Discretion In The Response To The Jury's Question Regarding Count II

Defendant also contends that the district court erred in its response to a jury question during deliberations. This claim is also without merit.

The district court's supplemental jury instruction in response to a question arising during deliberations is reviewed for abuse of discretion. <u>United States v. Smith</u>, 62 F.3d 641, 646 (4th Cir.1995)

21

(district court should answer jury's request for clarification of a charge fairly and accurately without creating any prejudice).

In the midst of deliberations, the jury, presumably through its foreperson, communicated a question to the court in writing regarding the Section 924(c) offense alleged in Count II.[10]  The jury's question read:

> "We need a clear understanding of count II.  One statement clearly states "Clock – which I think means Glock the other is left open for any gun.  Thank you. Wayne Keiter."

(J.A. at 355.)

Defendant contends that the trial court should have specifically advised the jury that the Beretta pistol found in the Black Acura could not be considered.  Instead, the trial judge sent a copy of the Bill of Indictment, which only identified a single firearm - the Glock pistol, into the jury room in response to the question.  (J.A. at 356.)  The district court answered the question in a concrete, non-prejudicial manner and did not abuse its discretion.

---

[10]The question and supplemental instruction also pertained to Count III, but the Appellant was acquitted on that charge.

F.  The District Court Did Not Abuse Its Discretion In Denying Request For Individualized Voir Dire Of Jurors Orndoff & Rose

Defendant contends that the trial judge abused his discretion when he denied counsel's request to explore further the potential bias of two prospective jurors via individual questioning.

The Court reviews the trial judge's decisions with respect to voir dire for abuse of discretion.  United States v. ReBrook, 58 F.3d 961 (4th Cir.1995).

Rule 24 of the Federal Rules of Criminal Procedure prescribes procedures for the examination of potential jurors.  Rule 24(a) reads in part:

> (1) In General.  The court may examine prospective jurors or may permit the attorneys for the parties to do so.
> (2) Court Examination.  If the court examines the jurors, it must permit the attorneys for the parties to:
>
> > (A) ask further questions that the court considers proper; or
> > (B) submit further questions that the court may ask if it considers them proper.

FED. R. CRIM. P. 24(a).

In this case, the trial judge conducted the voir dire by questioning the array collectively.  *See* United States v. Bailey, 112 F.3d 758, 769 (4th Cir.1997)("It is well established that a trial judge may question prospective jurors collectively rather than individually.")(*quoting* United States v. Bakker, 925 F.2d 728 (4th Cir. 1991)).  The attorneys in the case were not allowed to ask

23

questions of the venire but instead were required to suggest proposed questions to the court.

During voir dire, defense counsel requested that the trial judge conduct individualized voir dire of Jurors Orndoff and Rose. Juror Orndoff had been employed as a security guard "a long time ago" and Juror Rose indicated she had been the victim of an arson, as well as a witness to a robbery approximately twelve years prior. (J.A. at 224-28.) The trial judge properly invited the attorneys to persuade him that any individual follow-up was required and declined to allow any additional questions of these particular jurors. Defense counsel did not expressly challenge either juror for cause, but now contends that he should not have been forced to exercise a peremptory challenge to excuse these jurors. However, the trial judge having properly exercised its discretion in the matter, also properly left defense counsel to the remedy of use of peremptory challenges. Neither of these potential jurors was selected to serve on the Defendant's case, and Defendant was not prejudiced. Defendant's argument on this issue is without merit.

G. Defendant's Sentence Is Reasonable / The Sentencing Judge Was Not Required To Apply A Beyond A Reasonable Doubt Standard Of Proof In Determining Defendant's Relevant Conduct

Defendant contends that the trial court erred in imposing a sentence on Count I based upon a drug quantity which was greater than the quantity of drugs established by the jury's verdict and

24

in using the preponderance of the evidence standard to determine that quantity.

Applicable post-*Booker* precedent in the Fourth Circuit requires the sentencing court, in fashioning a reasonable sentence, to consult the U.S. Sentencing Guidelines and determine the advisory guideline range before consulting the other factors specified in 18 U.S.C. §3553(a). United States v. Moreland, 437 F.3d 424, 432 (4th Cir.2006). The district court in so doing applies the preponderance of the evidence standard in making factual determinations.[11]  The Court below did not err in this regard.

Defendant was sentenced to a term of 102 months imprisonment on Count I and a consecutive term of 60 months on Count II.[12]  (J.A. at 440-42.)  At trial, the jury found, beyond a reasonable doubt,

---

[11]Post-*Booker* precedent in the circuit recognizes the need for the sentencing judge to make factual findings for purposes of accurately calculating the advisory guidelines.  *See* United States v. Davenport, 445 F.3d 366, 370 (4th Cir.2006)(upward departures based upon judicial fact-finding by preponderance of the evidence are consistent with *Booker)*. However, we have not had occasion to explicitly address the question of the applicable burden of proof.
The majority of other circuits to consider the issue post-*Booker* have upheld the continued use of the preponderance standard. *See* United States v. Garcia-Gonon, 433 F.3d 587, 593(8th Cir.2006)(rejecting Fifth and Sixth Amendment challenges to preponderance of the evidence standard being applied to sentence-enhancing facts as long as sentence is within the statutory maximum); United States v. Mares, 402 F.3d 511, 519 n.6 (5th Cir.2005)(Commentary to Rule 32(I) calls for application of the preponderance of the evidence standard in determining advisory guidelines range); United States v. Tynes, 160 F.App'x 938 (11th Cir.2005).

[12]Defendant does not challenge the sentence imposed on Count II.

25

that Abraham was responsible for 5 grams or more of cocaine base but less than 50 grams of cocaine base. (J.A. at 485.) Based upon the jury's quantity finding, Defendant is subject to a statutory mandatory minimum and maximum of not less than 5 years and not more than 40 years.  21 U.S.C. §841(b)(1)(B) (prescribes penalty for 5 grams or more of a mixture or substance containing a detectable amount of cocaine base).  The 102 month sentence imposed fell within this statutory range.

The sentencing judge, in considering relevant conduct, found by a preponderance of the evidence that Defendant was responsible for just less than 50 grams of cocaine base.[13]  This finding, as a guideline matter, produced a base offense level of thirty, resulting in an advisory guideline range of 97 to 121 months. *See* U.S.S.G. §2D1.1(c)(5).  At sentencing, the district court made no adjustments to the base offense level, which therefore became the final offense level.  The trial judge ordered a sentence within that range - 102 months.

Defense counsel, however, argues that the district court was bound by the jury's factual finding, which was founded on the beyond a reasonable doubt standard, and that the court below thus had no choice but to use the minimum quantity encompassed within the verdict - five grams of cocaine base.  As a guideline matter,

---

[13]The district court explained that the jury's finding precluded the Court from finding an amount of 50 grams or more for sentencing purposes.  (J.A. at 413.)

26

five such grams would result in a base offense level of twenty-six and custody range of 63 to 78 months. *See* U.S.S.G. §2D1.1(c)(7).

There is no merit to this contention. The fact that drug quantity may be, as Defendant contends, an essential element of the offense goes only to the determination of the statutory range, not the guideline range. In arguing that the sentence imposed must be consistent with the jury's verdict, Defendant merely states the obvious. As explained above, the sentence was squarely within the statutory range <u>and</u> the guidelines range. There was no inconsistency.

Defendant's sentence is reviewed for reasonableness. <u>United States v. Booker</u>, 125 S.Ct. 738 (2005); <u>United States v. Hughes</u>, 401 F .3d 540, 546-47(4th Cir. 2005).

Because Defendant was sentenced within the advisory guidelines range, the sentence is presumed to be reasonable. <u>United States v. Green</u>, 436 F.3d 449, 457 (4th Cir.), *cert. denied*, ___ U.S. ___, 126 S.Ct. 2309, 164 L.Ed.2d 828 (2006). The district court consulted the advisory guidelines and then considered the factors within 18 U.S.C. §3553(a) in arriving at the sentence. There is nothing either procedurally or substantively improper about the sentence imposed. <u>Moreland</u>, 437 F.3d at 432.

For the foregoing reasons, Defendant's convictions and sentence are

<u>AFFIRMED</u>.

27