FILED
United States Court of Appeals
Tenth Circuit

July 10, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ANN MARIE MCNEAL,

     Defendant - Appellant.

No. 16-1054

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CR-00054-RM-2)**

_____

Robert T. Fishman, Ridley, McGreevy & Winocur, PC, Denver, Colorado, for
Defendant-Appellant.

Paul Farley, Assistant United States Attorney (Robert C. Troyer, Acting United States
Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado,
for Plaintiff-Appellee.

_____

Before **HARTZ**, **BALDOCK**, and **HOLMES**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

A jury convicted Defendant Ann Marie McNeal under 18 U.S.C. § 922(d)(1) for

disposing of a firearm to a convicted felon, her son Phinehas McNeal. Her principal

claim on appeal is that evidence seized from her home under a search warrant should

have been suppressed. The affidavit supporting the warrant was based largely on statements she made when interviewed by law-enforcement officers. She contends that some of what she said was improperly coerced by the officers and that the affidavit included false descriptions of her statements. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

The officers did not coerce Defendant when they told her of their reasonable belief that she could be prosecuted for providing false information to them. We need not address her false-description claim because the search-warrant affidavit established probable cause even if we exclude the allegedly false portions of the affidavit. We also briefly dispose of Defendant's two other issues on appeal. The district court did not commit plain error by failing to dismiss the indictment on the ground that the statute with which she was charged exceeds congressional power under the Constitution's Commerce Clause. And the evidence at trial did not support her requested momentary-possession jury instruction.

## I. BACKGROUND

In the late summer of 2014, the McNeals visited a sporting-goods store in Colorado Springs, Colorado. Phinehas, on parole at the time, pointed to a small pistol for Defendant to inspect. Although they left without making a purchase, Defendant returned on October 1 to purchase a .22-caliber revolver (the pistol). Phinehas was waiting in her car in the parking lot.

On November 22, Defendant purchased from a local pawnshop a second gun—a .22-caliber rifle. A week later the McNeals returned to the sporting-goods store, where

Phinehas purchased two boxes of ammunition and shoplifted other items. Store personnel confronted Phinehas, struggled with him, and called the police. The McNeals were taken to the local police station about 8:30 p.m. Phinehas was arrested for shoplifting and Defendant was arrested for misdemeanor obstruction of police.

Colorado Springs police learned that Phinehas was a convicted felon and that Defendant had purchased a pistol similar to the one Phinehas had previously pointed out to her at the sporting-goods store. Colorado Springs detective Roy Ditzler, who had been assigned to a gun task force of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, was called in to question Defendant.

Defendant was given her *Miranda* warnings shortly after 11 p.m. and was reminded of them, without repetition of the warnings, 53 minutes into the interview. She was questioned until 2:52 a.m., interrupted by two or three short breaks.

When asked about her visit to the sporting-goods store to look at firearms, Defendant acknowledged that she had purchased the pistol, that Phinehas knew of the purchase, that he had seen the gun, and that he "might have" fired a gun at her residence, Gov't Ex. 86, Tr. of Interview (Tr.) at 38.[1] Defendant also volunteered that Phinehas had "show[n]" her how to use the pistol on a shooting trip in Fountain, Colorado. *Id.* at 53.

At 1:36 a.m. Ditzler asked whether Defendant knew of any guns in her home other than the pistol. She twice denied that there were any others. When asked a third time,

---

[1] All citations to the videotaped interview are to the transcript of the video. With the exception of one clear error to be identified below, *infra* note 2, the relevant segments of the transcript appear to be an accurate representation of the video.

Defendant hesitated before saying, "I have to think. No, I don't think so." *Id*.

Suspecting that she was covering for her son, Ditzler warned Defendant against lying:

> DITZLER: So do you or don't you? Because I see where you're going with this, and you're going to get yourself in a lot of trouble, because I think you're thinking if we go over there and find some guns, you're going to think that you're going to come back and say that that was your gun too, to try to take some blame from -- from Phiny. . . . *[Y]ou protecting him or lying is not going to be -- not going to bode well for you.*
> DEFENDANT: Either way I'm going to federal prison too?
> DITZLER: Well, not right now. Right now your case is state, for obstructing.
> DEFENDANT: So I'm going to prison?
> DITZLER: For obstructing? No. You'll get booked into jail. You'll get a bond. *But if you're lying, on Phinehas's behalf, like you were getting ready to do, thinking about what other guns might be at your place that you can claim as yours so Phinehas doesn't get in trouble, yes.* We would look at indicting you on that.

*Id.* at 79–80 (emphasis added). Defendant promptly changed her answer and revealed that there was another gun—a rifle she had purchased from a pawnshop "[n]ot that long ago." *Id.* at 81. After complaining that Defendant had lied about almost everything, Ditzler asked why she bought the rifle. She responded, "There's a reason why. I was shot three times in the leg." *Id.* at 84. Ditzler briefly questioned her about whether Phinehas was the one who shot her and then brought in his supervisor, Sergeant Rafael Chanza. Chanza asked to look at Defendant's leg to see if "we need to get medical to take a look at you" and to "make sure that you're okay." *Id.* at 87. No skin was broken and Defendant did not appear to have any injuries resembling bullet wounds. After Chanza left the room, Ditzler asked Defendant several times whether Phinehas had shot her or was threatening her. Defendant did not answer.

Ditzler stepped out for a few minutes and brought Chanza back into the room at 2:26 a.m. Chanza spoke to Defendant for about two minutes, telling her "you're doing

4

the right thing by talking to [Ditzler]" but warning that she could be charged with a felony—attempting to influence a public official[2]—if she tried "to take the fall" for her son. Tr. at 93. He asked, "So are you going to do the right thing? Are you going to talk to the detective?" *Id.* at 94. She said, "I'll talk." *Id.*

After Chanza left the room Ditzler said, "Do you understand what the sergeant was saying? I mean, it's completely up to you if you want to keep talking. Nobody wants to force you to do anything you don't want to do." *Id.* He then gave her another opportunity to explain whether she had been coerced into purchasing the guns:

> Believe it or not, it's our job to -- to exonerate someone if they're not guilty of something. So I can see that you wanted to tell me things and you're hesitant. I think it's more because you're trying to protect Phiny. But, you know, the ball's completely in your court.

*Id.* Defendant then provided additional details about the rifle, admitting that she bought it for Phinehas and that he had access to it. She also informed Ditzler of a third gun at her trailer that belonged to Phinehas, one later discovered to be a shotgun.

The officers prepared a search-warrant affidavit describing Defendant's statements about the three guns: (1) her purchase of the pistol from the sporting-goods store, and her trip to Fountain, Colorado, with Phinehas to shoot it; (2) her purchase of the rifle from the pawnshop; and (3) Phinehas's keeping a shotgun in her trailer. The affidavit was used to

---

[2] The transcript here reads: "It's M2M plus a public official. It's a felony charge." Tr. at 93. But as the video demonstrates, and Defendant asserts, the correct transcription is "Attempt to influence a public official is a felony charge." Gov't Ex. 85, Video of Interview (Pt. 2) at 1:04:55–1:05:00; *see* Aplt. Br. at 5 & n.5 (After quoting the statement as we have, the brief says in a footnote, "The video recording of the interrogation makes clear that the nonsensical . . . portion of the transcript is incorrect, and that our quotation of Chanz[a]'s statement is accurate."). The government does not dispute this characterization.

obtain a search warrant for Defendant's trailer about two and a half hours later. Officers

discovered the three firearms next to personal items that appeared to belong to Phinehas.

Defendant was charged with knowingly disposing of a firearm to Phinehas, in

violation of 18 U.S.C. § 922(d)(1). She moved to suppress the evidence on the ground

that the search-warrant affidavit was tainted by statements that were false or coerced.

After an evidentiary hearing the United States District Court for the District of Colorado

denied her motion. It found that Defendant's statements were voluntary and that the

affidavit was adequately supported by the interview video. After the jury found

Defendant guilty, she was sentenced to three years' probation.

## II.    DISCUSSION

### A.  Issues Summarily Decided

We quickly dispose of two of Defendant's challenges on appeal. First, she

contends that Congress lacked power under the Commerce Clause to enact 18 U.S.C.

§ 922(d)(1), the statute she violated. She concedes, however, that she did not raise this

issue in district court. Our review is therefore only for plain error. *See United States v.*

*Howard*, 784 F.3d 745, 748 (10th Cir. 2015). For her to prevail, she must show that the

validity of her argument is "obvious under current well-settled law." *Id.* But, as she

acknowledges, her position is not supported by existing precedent of any federal

appellate court. She is not entitled to relief on this claim.

Second, Defendant argues that the district court improperly refused to grant her a

momentary-possession jury instruction, contending that the jury could have found that

Phinehas possessed a firearm only briefly. This court has never endorsed a momentary-

6

possession defense to a charge based on the unlawful possession of contraband. We have not needed to decide the matter because no case has presented facts that would justify the defense. As we have explained, if we were to adopt the defense, it would "only appl[y] if the defendant (1) momentarily possessed contraband and (2) either lacked knowledge that he possessed contraband or had a legally justifiable reason to possess it temporarily." *United States v. Washington*, 596 F.3d 777, 782 (10th Cir. 2010). As in *Washington*, the evidence here would not satisfy these conditions. In the present context, there would need to be evidence that Phinehas had a legally justifiable reason to possess the firearm for a brief period of time. But Defendant has not offered any such reason.

### B. Validity of Search Warrant

We now turn to Defendant's third and primary challenge—that the evidence obtained under the search warrant of her home should be suppressed because the affidavit supporting the warrant was based on involuntary and false statements. She argues (1) that Chanza improperly coerced her to make incriminating statements by threatening her with a felony prosecution if she was not forthcoming and (2) that the affidavit falsely reported what she said before the coercion. We reject the first argument. Because, as Defendant concedes, that is all that is necessary to sustain the warrant, we need not address the second.

### 1. Standard of Review

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness

under the Fourth Amendment." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) (brackets and internal quotation marks omitted). On the specific issue of coercion, we review "subsidiary factual questions, such as whether the police intimidated or threatened a suspect . . . under the clearly erroneous standard," but we review de novo the ultimate issue of voluntariness, which is a question of law. *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991).

Defendant suggests that our review of the evidence should be de novo "because this Court is in as good a position as the trial court to review the videotape [of the interrogation]." Aplt. Br. at 11. But there are compelling institutional reasons to always leave factual determinations to the district court in the first instance. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574 (1985) ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise."). As we declared in *United States v. Santos*, 403 F.3d 1120 (10th Cir. 2005), "The increasing availability of videotapes of traffic stops . . . does not deprive district courts of their expertise as finders of fact, or alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts." *Id*. at 1128 (internal quotation marks omitted); *see Muniz v. Rovira-Martino*, 453 F.3d 10, 13 (1st Cir. 2006) ("[W]e may not exercise *de novo* review over the district court's account of the video evidence in this case."). We therefore conduct our usual clear-error review.

If we decide that portions of the search-warrant affidavit are based on unlawfully coerced statements or that they deceitfully report what Defendant told officers, we must excise those tainted portions and determine whether the remainder of the affidavit would

support probable cause.  *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)

(intentionally false statement); *United States v. Anderson*, 981 F.2d 1560, 1568 (10th Cir.

1992) (evidence in affidavit tainted by prior unlawful search).

### 2.  Coercion

A confession runs afoul of the Fifth Amendment when it is obtained by

"government acts, threats, or promises that permit the defendant's will to be overborne."

*Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993); *see United States v. Williams*,

576 F.3d 1149, 1162 (10th Cir. 2009) ("[A] confession is only involuntary when the

police use coercive activity to undermine the suspect's ability to exercise his free will.").

Defendant has based her coercion claim on the following exchange with the

officers:

> CHANZA:  Hey, Ann.  Hang in there.  Ann, listen, um, we're obviously trying to give you the benefit of the doubt, okay, but now we have enough information to where you're really going down a path that you don't want to go down.  Okay?  Because *if you're taking the fall for your son, you're looking at a felony.  [Attempt to influence a public official is a felony charge.]*[3]  Okay?
> 
> So he's a man.  He's a grown man, and you're doing the right thing by talking to this detective because you know that he's working with the federal agents.  And obviously you don't want to take the fall for your son for something that he did.  Okay?
> 
> So you need to do the right thing here.  Okay?  You've already given him enough information, and, you know, we've given you enough opportunity here, enough ample opportunity, to basically talk to him about what happened here with him.  And basically we're at a point now  -- we're at a junction if you're -- *if you're willing to take the fall for your son, then you're going to get charged with a felony*.  I mean, that's just as simple as it gets, unfortunately.
> 
> You know, you look like, you know, you're a decent person.  You're really going down the wrong path.  I mean, you want to do the right thing, but then you're kind of taking it back.  So we're kind of -- at this point we can't just keep giving you any more time to do the right thing.  So you have to decide right now

---

[3] *See supra* note 2.

9

are you going to do the right thing or are you just going to take the fall.  Do you understand what I'm telling you, Ann?  Okay.  So can you sit up, please?  The detective is really -- I mean, he's really being patient with you, and we're all trying to be patient with you.
DITZLER:  The reason Sarge came in here is because we're moving on.  We've got search warrants to write for your place and booking paperwork for you and your boy still left to do.  So -- okay.
CHANZA:  So are you going to do the right thing?  Are you going to talk to the detective?
DEFENDANT:  I'll talk.

Tr. at 92–94 (emphases added).

The district court rejected Defendant's claim.  It "conclude[d] factually that when [the officers were] telling her, *You have to talk to me*, it is not, *You have to respond to my questions, in contravention of Miranda*."  R., Vol. 3 at 80.  Rather, the court found that Defendant "was directly being told that if she is persisting in lying or otherwise covering for Phinehas, she could get herself in a great deal of trouble" and that these were "accurate statements of the legal ramifications" of Defendant's conduct.  *Id*. at 79.  The court thus found Defendant's statements to be voluntary.  *See id*. at 80.

Defendant challenges the district court's ruling on two grounds.  First, she objects to the court's factual characterization of the exchange.  She contends that Chanza threatened her for "exercising her constitutional right to refuse to answer."  Aplt. Br. at 20.  She highlights the sergeant's statement that Defendant had "ample opportunity . . . to talk to [Ditzler] about what happened here," Tr. at 93, and his questions:  "So are you going to do the right thing?  Are you going to talk to the detective?"  *Id*. at 94.  Defendant raises a significant issue.  *Cf*. LaFave et al., 2 Criminal Procedure § 6.2(c) n.100 (4th ed. 2015) ("Quite obviously, a threat that failure to talk will result in prosecution for

10

withholding evidence [may be objectionable].")  But she takes Chanza's warning out of context.  She was never told that she had to talk.  The officers gave Defendant her *Miranda* warnings at the beginning of the interview and reminded her of them during the interview.  And immediately after Chanza departed, before Defendant had disclosed anything further, Ditzler reminded Defendant that "it's completely up to you if you want to keep talking.  Nobody wants to force you to do anything you don't want to do."  Tr. at 94.

Moreover, the conversation preceding Chanza's warning further supports the district court's factual finding that the warning was directed at lying.  Ditzler had earlier cautioned Defendant about the consequences of "lying, on Phinehas's behalf."  *Id*. at 80.  Defendant then changed her answer about whether there were additional guns in her home.  She claimed that she purchased the rifle because she had been shot in the leg.  But the officers could find no trace of a gunshot wound and Defendant was unwilling to say who shot her or whether she was being threatened.  Only then did Chanza warn Defendant that "[a]ttempt to influence a public official is a felony charge."  Aplt. Br. at 5.[4]  The officers' concern was not silence but falsehood.  We cannot say that the district court clearly erred in finding that the officers were warning Defendant about the consequences of misleading them and not of silence.

Second, Defendant argues that even if we accept the district court's characterization of the questioning, it still should have found that Defendant's statements were coerced.  This argument is not based on a contention that the district court erred in

---

[4]  *See supra* note 2.

11

concluding that Chanza's warning accurately stated the law. Defendant does not dispute that she could be charged with a felony if she were to mislead the officers. *See* C.R.S. § 18-8-306 (attempt to influence a public servant). On the contrary, she argues that "a true threat would be much more likely to overcome an individual's will than a fanciful one." Aplt. Br. at 21. We reject that argument. It is not per se coercion to present a suspect with correct information from which the suspect can make a reasoned decision.

We said some time ago that "[i]n order to establish that [defendant's] admission was coerced or involuntary as a matter of law, defendant must show that he was subject to threats of *illegitimate action*." *United States v. Tafoya*, 459 F.2d 424, 427 (10th Cir. 1972) (emphasis added). In *Tafoya* the police arrested the defendant and his sister after finding heroin in their homes. *See id*. at 425. The defendant argued that his statements were coerced because the officers threatened to arrest his grandmother, who lived with him, unless he confessed to possession of the heroin. *See id.* at 425–26. We rejected the argument that the police used the arrest of his sister or a threat to arrest his grandmother as a means to coerce him because each relative was a "legitimate subject of police inquiry." *Id*. at 426–27.

And in a case closer in time and facts to the one before us, we said: "That the troopers showed [the defendant] the cocaine and pointed out the possible consequences if convicted in an effort to elicit cooperation does not compel a finding of coercion." *United States. v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997)*; see United States v. Cruz-Mendez*, 467 F.3d 1260, 1267–68 (10th Cir. 2006) (consent to search was not

coerced by officer's statement that he would get a search warrant because he likely had probable cause to support a warrant).

Other circuits are in accord. The Fourth Circuit, sitting en banc, addressed a situation particularly on point. In *United States v. Braxton*, 112 F.3d 777, 779–80 (4th Cir. 1997), two officers interviewed the defendant at his mother's house about suspicious gun purchases. The officers did not provide *Miranda* warnings, *see id*. at 780, and told the defendant that "you can do five years because you're not coming clean," *id*. at 782 (internal quotation marks omitted). The defendant's ensuing confession was held to be voluntary. *See id*. at 781–82. The court observed that the officer's remarks were "a truthful statement about the potential consequences of making a false statement to law enforcement officers during an investigatory interview." *Id*. at 782. The court ruled that "[a]dmonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty . . . for making false statements does not constitute coercive police conduct rendering a statement involuntary." *Id*.; *see Dowell v. Lincoln Cty.*, 762 F.3d 770, 776 (8th Cir. 2014) ("An officer . . . may make a truthful statement regarding a possible punishment without it overbearing a defendant's will."); *United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) ("[A] recitation of the potential sentence a defendant might receive does not render a statement involuntary." (internal quotation marks omitted)); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("[T]elling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government." (original

13

brackets and internal quotation marks omitted)); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will."); *see also* LaFave, *supra*, 2 Criminal Procedure § 6.2(c) n.100 ("[A] mere threat to take action which would be lawful and necessary absent cooperation is not objectionable.").

Because Defendant does not challenge the proposition that she would be subject to prosecution for the felony offense of attempting to influence a public official if she lied to officers to protect her son, we see no error in the district court's ruling that her statements after Chanza's warning were not coerced. And because Defendant concedes in her opening brief that if her coercion argument is rejected, the affidavit contains sufficient accurate information to provide probable cause for the search warrant, we must affirm the district court's conclusion that the warrant was valid. There is no need for us to address Defendant's claim that certain statements within the affidavit were false.

### III.    CONCLUSION

We **AFFIRM** the district court's judgment.

14